Nos. 23-1116 & 23-1138

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,
*Appellee/Cross-Appellant,*

v.

CEDRIC CROMWELL,
*Defendants - Appellant/Cross - Appellee.*

_____

*On Appeal From A Judgment Of The United States District Court
For The District Of Massachusetts*

_____

## RESPONSE AND REPLY BRIEF OF
## APPELLANT/CROSS-APPELLEE CEDRIC CROMWELL

_____

ROBERT F. HENNESSY
FIRST CIRCUIT NO. 1158975
BBO NO. 675977

SCHNIPPER HENNESSY, PC
25 BANK ROW, SUITE 2S
GREENFIELD, MA 01301
413) 325-8541, (413) 325-8692-fax
*rhennessy@schnipperhennessy.com*

April 15, 2024

# TABLE OF CONTENTS

Table of Contents.......................................................................... i

Table of Authorities .................................................................. iv

INTRODUCTION AND SUMMARY OF THE ARGUMENT................ 1

ARGUMENTS ............................................................................ 5

**I.**    NO EVIDENCE SUPPORTABLY SHOWED THE EXISTENCE OF THE QUID PRO QUO ALLEGED—THAT EACH OF CHARGED DONATIONS OR GIFTS WAS RECEIVED BY RECIPROCAL AGREEMENT IN EXCHANGE FOR CROMWELL'S PERFORMANCE OF ANY OFFICIAL ACTS OF "PROTECTION" ............................................................................ 5

    A.    Absent Any Concrete Evidence Connecting the Charged Items of Value to any Exercise of (Or Promise Or Threat to Exercise) an Official Act by Cromwell, the "Evidence" Upon Which the Government Rests Its Case Is Ambiguous And Speculative And Therefore Insufficient To Allow The Jury To Draw Conclusions About The Existence Of A Quid Pro Quo Beyond A Reasonable Doubt ..................................................................... 5

    B.    The Government Cannot Salvage Its Case on Appeal by Repudiating for the First Time Standards that Are Not Plainly Erroneous Which the Government Itself Either Endorsed or Explicitly Requested Below.................................................. 23

**II.**    CROMWELL ADOPTS THE REPLY ARGUMENTS OF DEFENDANT DAVID DEQUATTRO THAT THERE WAS INSUFFICIENT EVIDENCE PRESENTED AT THEIR JOINT TRIAL TO SATISFY §666'S JURISDICTIONAL ELEMENT ................... 30

**III.**    CROMWELL ADOPTS THE REPLY ARGUMENTS OF DEFENDANT DAVID DEQUATTRO THAT THE DISTRICT COURT ERRONEOUSLY EXCLUDED DEFENSE EXPERT SKIP DUROCHER

WHOSE TESTIMONY WAS HIGHLY RELEVANT AND
EXCULPATORY.................................................................................... 31

IV. CROMWELL ADOPTS THE REPLY ARGUMENTS OF
DEFENDANT DAVID DEQUATTRO THAT THE DISTRICT COURT
ERRONEOUSLY PRECLUDED THE JURY FROM REACHING A
VERDICT UNTIL RECEIVING WRITTEN
INSTRUCTIONS.................................................................................... 32

V. THE DISTRICT COURT'S JUDGMENT OF ACQUITTAL ON THE
INDICTMENTS CHARGING HOBBS ACT VIOLATIONS WAS
PROPER AND CONSISTENT WITH GOVERNING LAW.... 33

A. In the Absence of Clear Evidence of Legislative Intent to
Designate Native American Leaders like Cromwell "Public
Officials" for purposes of the "under color of official right"
prong of Hobbs Act extortion, the rule of lenity precludes
conviction of Mr. Cromwell on that distinct theory of
liability..................................................................................... 34

1. Standard of Review ..................................................... 34

2. Argument ..................................................................... 34

B. Alternatively, This Court May and Must Affirm the Judgments
of Acquittal Below on the Additional Basis of Insufficient
Evidence of Establish the Quid Pro Quo Element of Hobbs Act
Extortion "Under Color of Official Right." ........................ 42

1. Standard of Review..................................................... 43

2. Legal Standards. ......................................................... 43

3. Argument ..................................................................... 45

VI. THE COURT SHOULD REJECT THE GOVERNMENT'S CROSS-
APPEAL OF CROMWELL'S SENTENCE...................................... 49

Conclusion.................................................................................. 50

Certificate of Compliance........................................................... 52

Certificates of Service................................................................. 53

Addendum................................................................................... 54

## TABLE OF AUTHORITIES

**Cases**

*Cleveland v. United States*, 531 U.S. 12 (2000) .................................. 41

*Evans v. United States*, 504 U.S. 255 (1992) ..................................... *Passim*

*Judicial Stds. Comm'n v. Not Afraid*, 245 P.3d 1116 (Mont. 2010) . 40

*McCormick v. United States*, 500 U.S. 257 (1991) ........................... *Passim*

*McDonnell v. United States*, 136 S. Ct. 2355 (2016)........................ 23-26,28

*McNally v. United States*, 483 U.S. 350 (1987) ................................ 41

*Morissette v. United States*, 342 U.S. 246 (1952).............................. 37

*Musacchio v. United States*, 577 U.S. 237 (2016).............................. 24-26

*Penobscot Nation v. Stilphen*, 461 A.2d 478, 489 (Me. 1983)........... 38

*Rewis v. United States*, 401 U.S. 808 (1971) ..................................... 41

*Scheidler v. NOW, Inc.*, 537 U.S. 393 (2003) .................................... 41-42

*United States v. Barquin*, 799 F.2d 619 (10th Cir. 1986)................... 40

*United States v. Biaggi*, 853 F.2d 89 (2d Cir. 1988).......................... 11

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015)............... 11,29

*United States v. Boots*, 80 F.3d 580 (1st Cir. 1996)........................... 38

*United States v. Brissette*, 919 F.3d 670 (1st Cir. 2019).................... 25,34-35

*United States v. Buffis*, 867 F.3d 230 (1st Cir. 2017)........................ 11

*United States v. Carrasco*, 79 F.4th 153 (1st. Cir. 2023)................... 26,28

*United States v. Correia*, 55 F.4th 12 (1st Cir. 2022)........................ 43

*United States v. Cruz-Arroyo*, 461 F.3d 69 (1st Cir. 2006).............. 15, 43

*United States v. Cruzado-Laureano*, 404 F.3d 470 (1st Cir. 2005).... 44

*United States v. D'Amico*, 496 F.3d 95 (1st Cir. 2007)..................... 44, 46

*United States v. Doe*, 61 F.3d 107 (1st Cir. 1995)............................. 42

*United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013) ................... 25

*United States v. Gracie*, 731 F.3d 1 (1st Cir. 2013)........................... 6

*United States v. Guzman-Ortiz*, 975 F.3d 43 (1st Cir. 2020)............. 23

*United States v. Hathaway*, 534 F.2d 386 (1st Cir. 1976).................. 34-35

*United States v. Manzo*, 636 F.3d 56 (3d Cir. 2011) ......................... 37

*United States v. Martínez*, 994 F.3d 1 (1st Cir. 2021)....................... 26

*United States v. Mazzei*, 521 F.2d 639 (3d Cir. 1975)....................... 39

*United States v. McDonough*, 727 F.3d 143 (1st Cir. 2013).............. 6,9,10

*United States v. McPhail*, 831 F.3d 1 (1st Cir. 2016)........................ 43

*United States v. Mora*, 598 F.2d 682 (1st Cir. 1979)........................... 23

*United States v. Morosco*, 822 F.3d 1 (1st Cir. 2016).......................... 29

*United States v. Pabón*, 819 F.3d 26 (1st Cir. 2016)........................... 27

*United States v. Percoco*, 317 F. Supp. 3d 822 (S.D.N.Y. 2018)........ 36

*United States v. Pinkham*, 896 F.3d 133 (1st Cir. 2018)..................... 50

*United States v. Pizarro-Berríos*, 448 F.3d 1 (1st Cir. 2006).............. 28

*United States v. Roberson*, 998 F.3d 1237 (11th Cir. 2021)................ 21

*United States v. Rodrigues*, 850 F.3d 1 (1st Cir. 2017)....................... 26

*United States v. Rodríguez-Peña*, 470 F.3d 431 (1st Cir. 2006).......... 42

*United States v. Román*, 942 F.3d 43 (1st Cir. 2019).......................... 42

*United States v. Terry*, 707 F.3d 607 (6th Cir. 2013).......................... 25

*United States v. Turner*, 684 F.3d 244 (1st Cir. 2012)....................... 11,21,29,43

*United States v. Urciuoli*, 613 F.3d 16 (1st Cir. 2010)........................ 8,11

*United States v. Valentini*, 944 F.3d 343 (1st Cir. 2019)................... 45

*United States v. Woodward*, 149 F.3d 46 (1st Cir. 1998)................... 8,11

*United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990)......................... 47, 50

*Wilkie v. Robbins*, 551 U.S. 537 (2007)................................................. 39-40

**Statutes**

18 U.S.C. § 201 .................................................................... 37

18 U.S.C. § 666 ................................................................... *Passim*

18 U.S.C. § 1951 ................................................................ 25,33,35,43

M.G.L.A. c. 268A, § 2 ........................................................ 38

**Other Authorities**

U.S.S.G. § 2C1.1 ................................................................ 49-50

Model Penal Code, Article 240, § 240.0 ......................................... 38

4 William Blackstone,
    Commentaries on the Laws of England (4th ed. 1770) ...... 39

## Note on Citations to the Record

This brief uses the following citation formats: portions of the record contained in the Appendix are cited as "App:[Page#]"; portions of the record contained in the Sealed Appendix are cited as "SRA:[Page#]"; portions of the record contained in Cromwell's Supplemental Appendix tendered herewith are cited as Supp.App:[Page#]"; portions of the record contained in Appellant's short addendum, appended hereto, are cited as "ADD:[page#]".

# INTRODUCTION AND SUMMARY OF THE ARGUMENT

This is an extraordinary case. Since November of 2020, the government has charged, prosecuted and tried Cedric Cromwell ("Cromwell"), former Chairman of the Mashpee Wampanoag Tribal Council and President of the Mashpee Wampanoag Gaming Authority ("the Gaming Authority") on charges of federal programs bribery, Hobbs Act extortion "under color or right" and conspiracy, all on the theory that each of a number monetary donations and gifts provided to Cromwell by architect David DeQuattro (DeQuattro) during the course of DeQuattro firm's contract with the Gaming Authority to act as owner's representative with respect to the construction of a planned casino, was solicited, given, and accepted as part of separate corrupt *quid pro quo* agreements *in exchange* for Cromwell's performance of, or agreement to perform, specific official acts to "protect" that contract. What makes the government's years-long pursuit of these allegations truly extraordinary is its continuing inability, years into litigation, to adduce *any* evidence demonstrating either: (1) that RGB's contract was at any point in particular peril or need of protection, (2) that Cromwell ever performed a *single* non-ministerial official act favoring RGB or its interests at any point during the contract, or

1

(3) that Cromwell even once, directly or indirectly, implicitly or explicitly, agreed, promised, threatened or insinuated through his words or actions his specific intent to perform (or agree to perform) any official act on behalf of DeQuattro, RGB, or its contract in exchange for the donations or gifts he received, or any official act *adverse* to DeQuattro, RGB, or its contract, if any of his requests were declined.

Unable even now to identify a single piece of concrete evidence connecting the charged donations or gifts directly or inferentially to specific official acts concerning RGB's contract (or promise or threat by Cromwell to take such specific official acts), the government's brief in opposition attempts to make its case essentially by: doubling down on various categories of circumstantial evidence – much of which Cromwell contests – which, despite speaking not at all to any particular connection between the charged items of value and any specific official act or omission by Cromwell, the government contends are "indicative" or "support[] the ... inference" of a *quid pro quo*. (Br. 22–49); and (2) seeking to reduce its burden of proof by claiming for the first time on appeal that its circumstantial case may not be measured against the "clear and unambiguous agreement" and "official act" standards that the government

itself not only repeatedly endorsed but also explicitly requested be applied in the District Court. (Br. 32–33).

I.     Viewed under any standard, and certainly under the standards on which this case was tried to the jury, the categories of evidence on which the government relies are patently insufficient to permit a rational juror to conclude, beyond a reasonable doubt and without undue reliance on speculation and conjecture, the existence of a quid pro quo in relation to any of the monetary donations or gifts provided to him. Its efforts to salvage its case by claiming for the first time on appeal that its case may not be measured against the standards that the government itself not only repeatedly endorsed but also explicitly requested be applied in the District Court must be rejected.

II-IV. Cromwell adopts the arguments set forth in Parts II-IV of the Response and Reply Brief of Appellant/Cross Appellee: (1) that the government's evidence was insufficient to satisfy § 666's jurisdictional element; (2) that the district court abused its discretion in excluding testimony from three proffered witnesses who would have supported defense arguments that the donation to One Nation, the BowFlex, and the hotel reservation were gifts, or at worst gratuities, as opposed to quid-pro-

quo bribes; and (3) that the district court's repeated admonishment to the jurors that they could not conclude their deliberations until receiving the written instructions constituted an abuse of discretion negatively implicating rights guaranteed by the Sixth Amendment. These arguments are readily transferrable to Cromwell who was tried jointly with Dequattro on common evidence and charges.

V.    The Government's claims of error on cross-appeal in the District Court's granting judgment of acquittal on the indictments charging Hobbs Act violations are unavailing. In the absence of clear evidence of legislative intent to consider or designate Native American leaders like Cromwell "public officials" for purposes of the "under color of official right" prong of Hobbs Act extortion—a discrete theory of liability that has been judicially construed in accordance with its common law meaning to apply *only* to "public officials" who misuse their "public" offices— the rule of lenity precludes conviction of Cromwell on that theory of liability. Alternatively, even if this Court becomes the first to construe Hobbs Act extortion "under color of official right" to reach Tribal, rather than just federal, state, and municipal leaders, this court may and must affirm the judgments of

acquittal below on the additional basis of insufficient evidence of establish the *quid pro quo* element.

VI. The government has waived its cross-appeal of Cromwell's sentence for lack of developed argument. Even overlooking that waiver, the district court did not err in declining to apply the disputed enhancement.

## ARGUMENTS

I.  **NO EVIDENCE SUPPORTABLY SHOWED THE EXISTENCE OF A QUID PRO QUO—THAT EACH OF CHARGED DONATIONS OR GIFTS WAS RECEIVED BY RECIPROCAL AGREEMENT IN EXCHANGE FOR CROMWELL'S PERFORMANCE OF ANY OFFICIAL ACTS OF "PROTECTION"**

    A.    **Absent *Any* Concrete Evidence Connecting the Charged Items of Value to any Exercise of (Or Promise Or Threat to Exercise) an Official Act by Cromwell, the "Evidence" Upon Which the Government Rests Its Case Is Ambiguous And Speculative And Therefore Insufficient To Allow The Jury To Draw Conclusions About The Existence Of A Quid Pro Quo Beyond A Reasonable Doubt.**

Not every solicitation or receipt of a thing of value by an official qualifies as bribery under 18 U.S.C. § 666(a)(1)(B). *United States v. Fernandez*, 722 F.3d 1, 26 (1st Cir. 2013). To sustain a conviction under this statute, the government is required to present evidence sufficient to establish beyond a reasonable doubt, *inter alia*, "that an agreement for a *quid pro quo* existed; that is, the receipt of something of value "in exchange

5

for" an official act. *United States v. McDonough*, 727 F.3d 143, 152 (1st Cir. 2013). See Gov't. Br. at 21 (citing *United States v. Gracie*, 731 F.3d 1, 3 (1st Cir. 2013)) (acknowledging that "[t]he heart of a bribery offense is the 'quid pro quo,' which is the giving of 'something of value'—the quid—in exchange 'for influence over some official conduct of the recipient'—the quo.'").

In defense of the sufficiency of its evidence to prove the existence of this essential *quid pro quo* beyond a reasonable doubt under its "protection of the contract" theory, the government first posits as undisputed "that RGB made the payments and the contract survived[.]" G.B. 21. But insofar as the use of the verb "survived" in this context is intended to connote or imply that the contract continued to exist in spite of some demonstrated peril to it, see e.g. https://www.merriam-webster.com/dictionary/survived (last visited Feb. 16, 2024) (defining the transitive verb "survived" as "to continue to function or prosper despite" e.g. "they survived many hardships"), such contention is both disputed and unsupported by the trial evidence.  As argued at length in Cromwell's opening brief, the government's evidence offered no suggestion that RGB's contract was at any point in particular peril, or that Cromwell undertook a

even one affirmative, non-ministerial official act in favor of DeQuattro's company or its interests at any point following the execution of its contract with the Gaming Authority. Cromwell Br. at 29-30.

Unable to rebut this argument with evidence, the government mostly scolds Cromwell for raising it. It decries "the argument that the government failed to prove any 'threat' to the RGB Contract [a]s fallacious and ignor[ant of] the government's theory of the case." G.B. 34. It is neither. The government's "theory of the case," such as it is, posits that "[g]iven what happened to D'Amato" the jury could rely on Cromwell's requests *alone* as sufficient evidence of an agreement and intent to perform specific official acts protecting RGB's contract in exchange for those donations and gifts. There are several reasons that this is not the case.

First, the government's "what happened to D'Amato" theory unduly presupposes as fact a circumstance that which it failed to establish beyond speculation at trial—that the termination of the D'Amato contract by a 4-1 majority vote of the Gaming Authority in April of 2014 was an arbitrary and baseless orchestration by Cromwell carried out over the will and satisfaction of the Gaming Authority. As explained at length in Cromwell's opening brief, the reasonableness of this hypothesis is gravely undermined

by a record replete both with evidence of valid reasons for dissatisfaction with D'Amato, and the uncontradicted testimony of multiple Gaming Authority members indicating that they each exercised their voting responsibilities equally and independently. Cromwell Br. at 36-39. [1]

Furthermore, insofar as Cromwell's position as Chair of the Gaming Authority afforded him some influence over the fate of RGB's contract, that fact alone is patently insufficient to establish every and any solicitation by him a de facto *quid pro quo* with the attendant corrupt motive. *Cf, United States v. Urciuoli*, 613 F.3d 11, 16 (1st Cir. 2010) (finding sufficient evidence of honest services violation where an official not only "had 'considerable power' in area of interest to payer" but also took *specific concrete steps* to advance the payor's interests which corresponded with increased payments and were revealed in communications between the official and payor); *United States v. Woodward*, 149 F.3d 46, 51, 53, 62 (1st Cir. 1998) (official not only had "discretion to act or not act in ways that would" benefit payer, but official's own direct statements expressly tied exercise of that discretion to expectation of illegal gratuities).

---

[1] At a minimum, this evidence puts the lie to any insinuation that Cromwell possessed unilateral power over the RGB contract. See G.B. at 23 (baselessly attributing the removal of "RGB's predecessor, D'Amato" to Cromwell individually).

To satisfy the all important "*pro*" aspect of the *quid pro quo* requirement, the government's evidence, at a minimum:

> must establish *a real understanding* that failure to make a payment will result in the victimization of the prospective payor or the withholding of more favorable treatment, a victimization or withholding accomplished by taking or refraining from taking official action, all in breach of the official's trust.

*Evans v. United States*, 504 U.S. 255, 274-275 (Kennedy, J, concurring in part and concurring in the judgment). *Accord McDonough*, 727 F.3d at 153 ("What is needed is an agreement . . . which can be formal or informal, written or oral."). This, the government's evidence fails to do.

Just as the government failed to adduce any evidence of an agreement or intent by Cromwell to perform any affirmative official act on behalf of DeQuattro or his firm in exchange for the donations or gifts he received, so too did it fail to adduce any evidence that Cromwell even once, directly or indirectly, implicitly or explicitly, threatened or insinuated through his words or actions that adverse official action might befall RGB's contract if the requests for donations or gifts were declined. Not one of the fifteen prosecution witnesses who testified—including the government's immunized and unindicted "co-conspirators" Joseph Beretta and Constantinos Mitrokostas—claimed to harbor so much as a belief, let alone

actual knowledge, such an agreement or understanding had ever been reached or intended. Nor did any government witness recount a single wink, a single nod or any other nonverbal conduct communicating or implying danger to the RGB contract if Cromwell's requests for campaign donations or gifts were declined.[2]

The salience of this stark evidentiary gap to the sufficiency of the government's case is difficult to overstate and aptly illustrated by the cases the government's own brief cites. Every single case cited in the sufficiency section of the government's brief in which evidence of an illicit *quid pro quo* was held to be constitutionally sufficient, cites at least *some* evidence of a communicated understanding between the payor and official, whether written or oral, direct or indirect, express or implicit, connecting payments received by an official to some effort or promise to engage in a discernible official act.[3] While Cromwell concedes that the agreement need not be

---

[2] Thus, the government's case is unaided by its invocation of the truism that a *quid pro quo* need not be stated "in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods." Gov't Br. at 22 (quoting *Evans*, 504 U.S. at 274 (Kennedy, J., concurring in part and concurring in the judgment).

[3] See *McDonough*, 727 F.3d at 153 (citing informant testimony, relating discussions with defendant, as to both existence and substance of *quid pro quo* agreement); *Evans*, 504 U.S. at 257 (citing evidence that undercover FBI

express, and that a jury may infer a *quid pro quo* from circumstantial

evidence, it is nevertheless damning to the government's case that not one

case cited in its brief or found by Cromwell has permitted a jury to infer a

*quid pro quo* in the circumstances here presented, without *any* factual

evidence connecting the *quid* and the *quo*.

Surprisingly (or not), the government spends little time in its brief

grappling with the implications of its failure to adduce anything close to

the type of concrete linking evidence relied on in the cases it cites. Instead,

---

agent made donations in conjunction with videotaped solicitations of concrete official action); *Blagojevich*, 794 F.3d at 734 (noting that direct evidence of offers to exchange Senate appointment and government funding for large cash donations "much of it from [defendants'] own mouth, [wa]s overwhelming"); *Urciuoli*, 613 F.3d at 14 (noting evidence, including the communications between payor and official, that payor hired official and increased official's pay in conjunction with official's specific acknowledged efforts to exert official pressure on behalf of payor); *United States v. Woodward*, 149 F.3d 46, 51, 53, 62 (1st Cir. 1998) (citing evidence of official's own direct statements expressly tying exercise of official discretion in favor of payor to expectation of illegal payments); *United States v. Biaggi*, 853 F.2d 89, 99-100 (2d Cir. 1988) (citing evidence, including surveilled calls reflecting official's agreement to take specific official action on behalf of payor lobbyist following gift and communications between lobbyists that cost of gifts was "good money invested"); *United States v. Turner*, 684 F.3d 244, 248 253 (1st Cir. 2012) (citing video evidence of a handover of cash recorded by a concealed camera worn by an informant who testified to his understanding of the terms of the *quid pro quo*); *United States v. Buffis*, 867 F.3d 230, 235 (1st Cir. 2017) (evidence that police chief explicitly told payor that "if they reached an agreement, he would have [criminal] case dismissed").

it reaches for various categories of evidence – much of which Cromwell contests – which, while speaking not at all to any particular connection, the government contends are "indicative" or "support[] the ... inference" of a *quid pro quo*. On the basis of this "evidence" the government invites this Court to make all sorts of unwarranted speculations and to find sufficient evidence to support the existence of the requisite agreed-to exchange, despite the utter absence of concrete linking evidence. G.B. at 24-28.

For example, the government urges that support for an inference of *quid pro quo* may be found in its arguments that Cromwell "acted like he was entitled" to the donations and gifts he received and "DeQuattro and Beretta took Cromwell's requests not as friendly suggestions but as demands they were obligated to meet." G.B.23-24. But these arguments lack both record support and probative force with respect to the existence of a *quid pro quo*.

First, the government's urged inference of Cromwell's "entitlement" rests on what it claims was Cromwell's "giving DeQuattro instructions on *how* to get him the cash and calling him for updates when the First Check was delayed." Gov't Br. at 23. But the record is devoid of evidence that Cromwell ever requested or received and "cash" from DeQuattro, let alone

"instructed" on *how* to get cash to him. Indeed, despite the government's repeated references to "demands" throughout its brief, the record fails to establish that Cromwell ever "demanded" anything. Not once in Beretta's immunized testimony does he characterize Cromwell's monetary solicitations as "demands" but rather indicated that Cromwell "request[ed]" App. 798, or "was asking" App.799,801, for contributions. As to the exercise bike, Beretta's testimony was merely that DeQuattro "said the [Cromwell] was *looking* for an exercise bike[.]" App.823-824. Cromwell's inquiry about a hotel room, communicated to DeQuattro via text message that was then forwarded to Beretta, asks whether "[i]t is possible that you can get me a nice hotel room" also far from a "demand." App. 1586. The record reflects with respect to the first donation Cromwell "ask[ed]" for a campaign contribution, "requested" that it be in the form of a personal check made out to CM International, and then followed-up with DeQuattro approximately two weeks later to "ask[] where it stood". App.780,782. Neither the fact of Cromwell's requests nor the circumstances surrounding them comes close to establishing a level of entitlement that might make reasonable the inferences of implied threat and duress the government needs to draw from them.

Nor does the trial evidence support a reasonable inference that Beretta and DeQuattro "took Cromwell's requests not as friendly suggestions but as demands they were obligated to meet" G.B. at 24. The government's inferential case that Cromwell's requests were understood and treated "as demands they were obligated to meet" in order to protect the RGB contract is weak and speculative. They are based on claims: (1) that "DeQuattro *sometimes* did not bother to share [Cromwell's explanation for his requests] with Beretta, and Beretta did not bother to ask", and (2) that DeQuattro and Beretta failed to engage in the due diligence suggested by RGB's lawyers. GB:24-25 (emphasis added). As to the first of these claims, the immunized Beretta testified over and over again that he understood and treated DeQuattro's payments as "political" or charitable contributions. App:780,783,792,798,807. Even in the sole portion of the Beretta's testimony the government's cites in support of its claims, Beretta testifies that DeQuattro "came in and said he did another 10,000-dollar *donation*[.]"[4] As to the purported failure to engage in due diligence, the facts that Beretta and DeQuattro sought legal advice, that Dequattro,

---

[4] Notably, this reference to "donation" is omitted from the block quote upon which government relies. *See and compare,* GB:25 and App.817.

following the attorney's advice, delayed the first check until being assured that CM was a corporation in good standing, and that Beretta and DeQuattro sought legal advice again with respect to the last donation which was to be payable to a different entity, belie rather than support the inference that DeQuattro and Beretta believed they had to make the payments to insulate the contract from adverse action by Cromwell.

The government's supposition as to how Beretta and DeQuattro "took Cromwell's requests" founders further on the government's own failure, despite entering into a cooperation agreement with Beretta that granted him transactional and testimonial immunity, [1571-1572], to elicit *any* testimony from their star witness that he or DeQuattro believed or understood any of Cromwell's requests to be implied threats or related in any way to the RGB contract.[5] *Compare, United States v. Cruz-Arroyo*, 461

---

[5] The government's defense to Defendants' Motion to Dismiss a year before trial indicated that, with respect to its burden of proving "directly or indirectly what the intent of the defendants was" that "the ligament that ties that together is going to be the testimony of the co-conspirator." Add:19. The government claimed at that time: "[t]he evidence that we have is going to come from the co-conspirator's testimony primarily, that is the company president. He's the one who communicated with Mr. DeQuattro about the demands made by Mr. Cromwell, what he wanted and what their understanding was *about what would happen* –" and assured a dubious District Court—inaccurately as it turns out— that "[t]here is more in terms

F.3d 69, 72 (1st Cir. 2006) (payor expressly testified at trial that he and

partner "felt obligated" to provide benefit to public official). This is not a

small and insignificant detail, particularly given Beretta's testimony on

cross examination acknowledging prior statements to the FBI that he

"would not have signed off on donations if it was in any way connected to

RGB's contract or keeping the business" App. 846.[6] The government asserts

that this direct evidence of DeQuattro's understanding is "misleading[]"

and must be ignored because DeQuattro's trial testimony conceded the

inaccuracy of *another* statement during the FBI interview. GB:27 n.5 (citing

[JA.828, 846]). But the government does not claim, nor could it, that

DeQuattro's unequivocal statement of his understanding to the FBI was

contradicted by his testimony or any other evidence at trial. Had the

government actually harbored doubts about the veracity of DeQuattro's

exculpatory statements to the FBI solicited on cross (or confidence that its

immunized star witness might contradict those exculpatory statements or

---

of what the co-conspirator will testify to at trial" than merely reported
statements of ambiguous dissatisfaction. Add: 16 (emphasis added).

[6] The Agent who interviewed DeQuattro during the FBI's investigation
testified at trial that DeQuattro, like Beretta, asserted that there was "no
relationship between the political donations that he made to Mr. Cromwell
and anything to do with the casino or the casino contract." App.949-950.

provide other information helpful to the prosecution if asked under oath), it could have elicited such information on re-direct examination. Having failed or chosen not to do so, the government cannot now reasonably establish through speculative inference that its own immunized witness possessed a state of mind and understanding of which he did not testify and which his admitted and unimpeached statements directly contradict.

In a tacit concession of the relative weakness of its inferential case that Beretta and DeQuattro felt "obligated to meet" Cromwell's requests for *donations*, the government claims that "[t]he evidence of DeQuattro and Beretta's thoughts about the payments [sic] was *particularly* strong for the Bowflex and Hotel Stay." GB.25. (emphasis added). The evidence claimed as "particularly strong" reduces to evidence that Beretta, when informed by DeQuattro that Cromwell was "was looking for an exercise bike" following his back surgery, responded "I'm not buying him a new bike. Let me see what's on Craigslist[,]" [JA.824], and DeQuattro's text message to Beretta: "Joe u can't think of this stuff..... what is next?" in connection to Cromwell's request for a hotel room. GB.26 (citing JA.824, 829-32). While these isolated comments might support an inference of "displeasure" with the requests of a high maintenance (or, in the words of the District Court

"graspy" App:1989) client, they fall far short of establishing beyond conjecture a "real understanding" or belief by Beretta and DeQuattro that they were "obligated to meet" those requests in order to protect the RGB contract.

On its face, Beretta's insistence on obtaining a used BowFlex on Craigslist rather than purchasing one new suggests he had no concern that disappointing Cromwell would place the RGB contract in jeopardy. More broadly, the nature and timing of both gifts—a BowFlex given shortly after Cromwell's release from the hospital following back surgery for physical ailments that exercise could ameliorate, App:519-20, and a hotel stay provided to an important client for his birthday more than three years into a project which, despite RGB's completely successful operation of it, had been effectively halted to a federal court injunction, *see* GB:24—paint a clear picture of gifts borne of friendship between Cromwell and DeQuattro and/or the desire to promote RGB's interest in cultivate future business opportunities, rather than capitulations necessary (and understood by Beretta and DeQuattro to be necessary) to avoid Cromwell's arbitrary and baseless cancellation of the RGB contract, as speculated by the government. Again, this resort to speculation was a choice made by the government in

this case. Had it indeed possessed at trial anything close to the level of confidence as to Beretta's and DeQuattro's understanding of Cromwell's requests that it claims on appeal, it could have elicited objective and useful information on that matter from the immunized Beretta. It did not, leaving the jury and this Court to guess Beretta's and DeQuattro's understanding from "evidence" that is at least one step removed from concrete and specific facts. This "evidence" fails to support a reasonable inference of an agreement or "real understanding" among the parties that the gifts and donations given to Cromwell were necessary to avoid Cromwell's arbitrary and baseless cancellation of the RGB contract. It is not even close.

The remainder of circumstances and argument the government points to as "evidence" of the existence of a alleged *quid pro quo*, namely purported "concealment" and "lies" allegedly told by DeQuattro during an interview by the FBI fails to move the needle closer towards a finding of *quid pro quo* beyond a reasonable doubt.

As to the arguments concerning concealment, it must be noted at the outset that the government offered no evidence at trial of any concealment by Cromwell with respect to any of the transactions resulting to any of the substantive charges. The donation charged substantively as federal

programs bribery in Count Two (and as extortion under color of right in Count Seven) was made by check payable directly to One Nation Development, an entity formed by Cromwell in his own name. App:1420. Likewise, the BowFlex charged in Count Three (and Count Eight) was delivered directly to Cromwell's home where DeQuattro, in yet another indication of friendship, personally helped Cromwell set up the machine. Finally, the hotel stay charged in Count Three (and Count Ten) was booked in Cromwell's name, which appeared on the hotel records. App:1587-1591.

The record does contain evidence that Cromwell requested that early contributions to his re-election campaign be payable to CM International and thereafter directed his friend and CM International's principal, Mitrokostas, to purchase treasurer's checks in varying amounts payable either to Cromwell or to One Nation. App:580,588,591-595,1406-1412,1413. The probative value of this evidence with respect to the specific question of *quid pro quo* is diminished greatly by the obvious panoply of reasons — other than consciousness of guilt of the specific crimes charged — why a political candidate might prefer to keep the fact or source of campaign contribution undisclosed. This it particularly true in assessing the actions of a tribal leaders like Cromwell who, as was stipulated to at trial, are not

subject to federal or state laws governing the solicitation, acceptance, recording or disbursement of campaign contributions. App. 1141-1142. In any event, although "evidence of concealment" has on occasion been cited as a *bolstering* factor in cases requiring proof of a *quid pro quo, see e.g. Turner,* 684 F.3d at 258 (noting that record evidence containing explicit recorded statements tying particular payment to particular official acts "*also* had evidence of . . . concealment of the crime and consciousness of guilt, which supported its verdict on the Hobbs Act count") (emphasis added), such bolstering evidence has never been held sufficient on its own to support an inference of *quid pro quo* on a record completely silent as to any connection between *quid* and *quo* as was presented in this case.[7] The government's evidence of alleged concealment was ambiguous and inconclusive and therefore insufficient to allow the jury to draw conclusions about the existence of a *quid pro quo* beyond a reasonable doubt. The government's arguments concerning purported lies told to the FBI are also unavailing. None of these was by Cromwell and therefore cannot be used to establish

---

[7] In *United States v. Roberson*, 998 F.3d 1237, 1249 (11th Cir. 2021), on which the government relies, GB:26, the government was not required to prove a *quid pro quo* at all and the evidence of concealment merely bolstered an inference of "a corrupt state of mind" grounded primarily in other evidence including "vast paper trail and the testimony of [the public official]."

in him any consciousness of guilt. Moreover, as explained at length in co-defendant David DeQuattro's Reply Brief at pp. 17-18, the evidence does not support the characterization of DeQuattro's statements as "lies" but does show that DeQuattro freely acknowledged $40,000 as the amount of the checks to CM and even volunteered to check his records to be sure, App:945-46, and affirmatively denied that the payments were in any way related to the casino project. App:949-50.

In sum, in the absence of *any* concrete evidence establishing (1) that RGB's contract was at any point in particular peril or need of protection, (2) that Cromwell ever performed a *single* non-ministerial official act favoring RGB or its interests at any point during the contract, or (3) that Cromwell even once, directly or indirectly, implicitly or explicitly, agreed, promised, threatened or insinuated through his words or actions his specific intent to perform (or agree to perform) any official act on behalf of DeQuattro, RGB, or its contract in exchange for the donations or gifts he received, or any official act *adverse* to DeQuattro, RGB, or its contract, if any of his requests were declined, or any other concrete evidence connecting any of the charged donations or gifts, either directly or indirectly, to any specific official act by Cromwell the "evidence" the government relies on as

"indicative" or "support[] the ... inference" of a *quid pro quo*, is ambiguous and inconclusive and therefore insufficient to allow the jury to draw conclusions about the existence of a quid pro quo beyond a reasonable doubt. While "it is true that the jurors may draw legitimate inferences from the evidence ... that does not mean that they have license to let their imaginations run rampant...." *United States v. Mora*, 598 F.2d 682, 684 (1st Cir. 1979). Here, the government's marginal evidence simply "cannot do all that the government needs it to." *United States v. Guzman-Ortiz*, 975 F.3d 43, 54 (1st Cir. 2020). Cromwell's convictions must be reversed.

**B.     The Government Cannot Salvage Its Case on Appeal by Repudiating for the First Time Standards that Are Not Plainly Erroneous Which the Government Itself Either Endorsed or Explicitly Requested Below**.

For the first time on appeal, the government argues that this Court's sufficiency review need not—indeed, *may* not—consider whether the its evidence at trial sufficed to show beyond a reasonable doubt either a *quid pro quo* agreement that was "clear and unequivocal" (as required for allegedly corrupt campaign contributions under *McCormick v. United States*, 500 U.S. 257 (1991)), or one that involved an "official act" within the narrowing construction of that term established in *McDonnell v. United States*, 136 S. Ct. 2355 (2016). In what can only be characterized as a head-

23

spinning about-face, the Government now claims that the Court's *McCormick* and *McDonnell*-derived instructions—*instructions which the government not only repeatedly endorsed but also explicitly requested below*[8]—may not be applied on appeal because, in the government's current telling, they erroneously elevated its burden of proof beyond that required by statute. [Gov't. Br. at 32-33].

As justification for this wholesale post-hoc revision, the government cites *Musacchio v. United States*, 577 U.S. 237 (2016), which considered a procedural issue: how to conduct sufficiency analysis when "a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element," *id.* at 243. *Musacchio* does nothing to support the government's sudden repudiation of its prior positions or its effort to substitute a less burdensome theory of its evidence for the first time in this Court.

---

[8] See App. 1345, 1900-1901 ("the Court correctly defined th[e] term [official act]"); App. 1333-1335 (requesting "clear and unequivocal understanding" articulation: "our suggestion would be that they were made in exchange for an agreement, which is proved clear or the government has proved or that it is clear and unequivocal that Mr. Cromwell, blah, blah, blah.").

First, neither *McCormick* nor the substantive standards derived therefrom "adds" any extra "element" to the offenses charged. Rather, it merely establishes substantive guidelines for determining whether the government has carried its burden of establishing the element of an actionable *quid pro quo*, which, this Court has made clear (and the government does not contest) remains essential to both bribery under 18 U.S.C. § 666(a)(1)(B), *Fernandez*, 722 F.3d at 26, and "official right" extortion under 18 U.S.C. § 1951, *United States v. Brissette*, 919 F.3d 670, 679 (1st Cir. 2019). *See United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) ("adjectives do not add a new element to these criminal statutes but signal that the statutory requirement must be met—that the payments were made in connection with an agreement, which is to say 'in return for' official actions under it.").

Second, to the extent that *McDonnell*'s "official act" requirement may be cognizable as a discrete element, the government fails to establish that its application in this case was incorrect or superfluous so as to implicate the holding in *Musacchio*. *Compare, Musacchio*, 577 U.S. at 241 ("The parties agree that this instruction was erroneous"). While the government concedes, as it must, that "this Court has yet to decide the issue" of

whether an 'official act' is statutorily required by § 666, [Gov't. Br. at 33], it fails to acknowledge that in circumstances identical to those here—where "the government did not dispute the point and in which the jury had been instructed that the offense does contain an 'official act' element"—this Court has expressly proceeded "on the understanding that § 666 *does* contain an 'official act' element." See e.g., *United States v. Carrasco*, 79 F.4th 153, 161 (1st. Cir. 2023) (citing *United States v. Martínez*, 994 F.3d 1, 6-7 (1st Cir. 2021) (emphasis added). Against this jurisprudential backdrop, the government's claim that the *McDonnell* "official act" standard is "demonstrably incorrect" and thereby barred by *Musacchio* is specious.

Insofar as the government is seeking to assert, for the first time on appeal, the *substantive* argument suggested in its brief, that "it makes no sense to apply the *McDonnell* "official act" standard to § 666", that argument, which was never presented to the district court despite ample opportunity to do so, has been forfeited. *United States v. Rodrigues*, 850 F.3d 1, 13 n.6 (1st Cir. 2017) (holding that a party may not advance new arguments for the first time on appeal.").

Likewise forfeit is the government's new substantive demand that it must be liberated on appeal from the *McCormick*-based "clear and

unequivocal agreement" standard that it requested below because, in its own estimation, "[t]aking the evidence in the light most favorable to the verdict, a rational jury readily could have found that none of the convicted payments were campaign donations subject to *McCormick*." [Gov't. Br. at 33]. In their Rule 29 motions for acquittal, Mr. Cromwell and Mr. Dequattro repeatedly invoked *McCormick*-based "clear and unequivocal agreement" standard, and the government neither argued against the applicability of that standard nor objected to its use. To the contrary, up through and including its opposition to Mr. Cromwell's renewed post-verdict motion, the government expressly conceded that it "had to prove a clear and unequivocal agreement between Cromwell and DeQuattro . . . ." Supp.App.:016.

Notably, the government fails to claim or develop any argument that "clear and unequivocal agreement" and "official act" standards constitute plain error and has therefore waived that argument as well. *United States v. Pabón*, 819 F.3d 26, 33 (1st Cir. 2016) (finding appellant waived plain-error review by not making any effort in his principal brief to explain why the claimed error constituted plain error). The government, moreover, cannot salvage a neglected argument in a reply brief or at oral argument. See

*United States v. Tosi*, 897 F.3d 12, 15 (1st Cir. 2018) ("[A]rguments... raised for the first time in a reply brief need not be considered."); *United States v. Pizarro-Berríos*, 448 F.3d 1, 5-6 (1st Cir. 2006) (holding that arguments raised for the first time at oral argument are deemed waived). In neglecting to address the elements of the plain-error rule, the government has waived its opportunity to argue that the district court committed plain error when it required that each *quid pro quo* charged "be established clearly and unequivocally beyond a reasonable doubt" and involve an "official act" within the narrowing construction of that term established in *McDonnell*.

In any event, there is no plain error. As noted above, there is no controlling authority from this Court at the time of trial or since that would have precluded the application of *McDonnell*'s "official act" requirement to this case. See *Carrasco*, 79 F.4th at 161 (citing prior cases that proceeded "on the understanding that § 666 does contain an 'official act' element"). Nor is there controlling authority limiting *McCormick* prophylactic principles to circumstances in which the bona fides of a purported campaign contribution are not disputed by the government. Were this the standard, it is difficult to see how even the payments made to McCormick himself, which were made in cash and went unrecorded as contributions by both

donor and recipient, *McCormick*, 500 U.S. at 260, could not have been "subject to *McCormick*." Tellingly, none of the cases cited by the government is to the contrary. In *Turner*, 684 F.3d at 253, which the government cites for the proposition that "[o]utside of the campaign contribution context," "implied" quid pro quo is sufficient" this Court specifically emphasized in its analysis that "Turner does not argue that this is a campaign contribution case." *Id.* at 253. Whereas in *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015), the Seventh Circuit, while noting that a jury was entitled on the facts to conclude that money solicited as campaign contributions was "for [a public official's] personal benefit rather than a campaign", nevertheless noted with approval jury instructions that "track[ed] *McCormick*." *Id.* at 733, 738.

Absent any controlling authority precluding the district court's "clear and unequivocal agreement" and "official act" standards, any claim that they constituted "plain error" (even if properly raised) is precluded. See *United States v. Morosco*, 822 F.3d 1, 21 (1st Cir. 2016) (explaining that "plain error" is "an indisputable error by the judge, given controlling precedent" (quotation marks omitted)). Accordingly, there can be no challenge at this

point to the use of these standards to inform the assessment of the sufficiency of the government's evidence to convict.

## II. CROMWELL ADOPTS THE REPLY ARGUMENTS OF DEFENDANT DAVID DEQUATTRO THAT THERE WAS INSUFFICIENT EVIDENCE PRESENTED AT THEIR JOINT TRIAL TO SATISFY §666'S JURISDICTIONAL ELEMENT.

Cromwell adopts and incorporates herein by reference the arguments set forth in Part II of the Response and Reply Brief of Appellant/Cross-Appellee David Dequattro that the government's evidence was insufficient to satisfy § 666's jurisdictional element. As explained in Cromwell's opening brief wherein Cromwell adopted Dequattro's principal arguments with respect to § 666's jurisdictional element, the issue raised and arguments made are readily transferrable to Cromwell who was tried jointly with Dequattro on common evidence and charges carrying an identical jurisdictional requirement. See 18 U.S.C. §666(a)(1)(B) and (b) (requiring for bribery, a specific intent "to be influenced or rewarded in connection with any business, transaction, or series of transactions of" an "organization, government, or agency" receiving $10,000 in federal benefits annually). Because the sole entity with business with RGB that could have been influenced by an illegal bribe (the Gaming Authority) received no federal program benefit and the sole entity that received federal benefits

30

(the Tribe) was not a party to the contract that related to the alleged bribery, Cromwell's convictions, like Dequattro's, cannot stand.

## III. CROMWELL ADOPTS THE REPLY ARGUMENTS OF DEFENDANT DAVID DEQUATTRO THAT THE DISTRICT COURT ERRONEOUSLY EXCLUDED DEFENSE EXPERT SKIP DUROCHER WHOSE TESTIMONY WAS HIGHLY RELEVANT AND EXCULPATORY.

Cromwell adopts and incorporates herein by reference the arguments set forth in Part III.B of the Response and Reply Brief of Appellant/Cross-Appellee David Dequattro that the district court erred in excluding a defense expert Skip Durocher who was prepared to testify, based on decades of practice as an attorney in the area of Indian law, that gift-giving in tribal culture is "accepted and in some instances expected" and that such gifts may be provided to cultivate a relationship with the legitimate hope of developing future business rather than as part of a quid-pro-quo. As explained in Cromwell's opening brief wherein Cromwell adopted Dequattro's principal arguments, these issues and arguments are readily transferrable to Cromwell for whom this proffered testimony would have provided the jury with an alternative explanation for DeQuattro's gifts to Cromwell, and where, as set forth above, the evidence against Cromwell in

this case was, assuming arguendo the Court rejects DeQuattro's Rule 29 argument, only minimally sufficient to go to the jury.

## IV. CROMWELL ADOPTS THE REPLY ARGUMENTS OF DEFENDANT DAVID DEQUATTRO THAT THE DISTRICT COURT ERRONEOUSLY PRECLUDED THE JURY FROM REACHING A VERDICT UNTIL RECEIVING WRITTEN INSTRUCTIONS.

Cromwell adopts and incorporates herein by reference the arguments set forth in Part IV of the Response and Reply Brief of Appellant/Cross-Appellee David Dequattro that the district court's repeated admonishment to the jurors that they could not conclude their deliberations until receiving the written instructions constituted an abuse of discretion negatively implicating rights guaranteed by the Sixth Amendment. As explained in Cromwell's opening brief wherein Cromwell adopted Dequattro's principal arguments, these arguments are readily transferrable to Cromwell who was identically situated to Dequattro with respect to the instructions and timely objected both to the court's admonitions and refusal to instruct in writing with respect to the requirement of proof beyond a reasonable doubt. App. 1363,1366,1371,1373.

## V. THE DISTRICT COURT'S JUDGMENT OF ACQUITTAL ON THE INDICTMENTS CHARGING HOBBS ACT VIOLATIONS WAS PROPER AND CONSISTENT WITH GOVERNING LAW.

In his pre- and post- judgment Rule 29 motions, Cromwell sought judgment of acquittal on all the Hobbs Act charges on multiple grounds, including that: (1) "that the fatal deficiencies in the Government's proof on both ends of the requisite *quid pro quo* exchange apply equally and forcefully . . . " to Count Six (Conspiracy to Commit Extortion in violation of 18 U.S.C. § 1951) and Counts Seven, Eight, Nine and Ten (Extortion in violation of 18 U.S.C. § 1951)"; and (2) in the absence of clear evidence of legislative intent to designate Native American leaders like Mr. Cromwell "public officials" for purposes of the "under color of official right" prong of Hobbs Act extortion, the rule of lenity precludes conviction of Mr. Cromwell on that theory of liability. App.1872-1875.

Without reaching the first of these grounds, the District Court granted relief on the second. The court noted that, unlike § 666 which was "amended to make it[s application to tribal leaders] clear", § 1951, the statute under which "extortion claim, extortion under color of official right" arises, "does not specify tribes or tribal leaders as officials. And my view is I have to grant acquittal with respect to that." App. 2037.

**A.    In the Absence of Clear Evidence of Legislative Intent to Designate Native American Leaders like Cromwell "Public Officials" for purposes of the "under color of official right" prong of Hobbs Act**

**extortion, the rule of lenity precludes conviction of Mr. Cromwell on that distinct theory of liability.**

Contrary to the framing set forth in the government's brief, the issue of the Hobbs Act's applicability raised by Cromwell and presented to this Court on appeal is *not* whether the Hobbs Act is inapplicable *in its entirety* to tribes and tribal leaders on account of their sovereign immunity. GB at 76-84. The question, rather, is whether the Act's prohibition against extortion "under color of official right"—a discrete theory of liability that has been judicially construed in accordance with its common law meaning to apply *only* to "public officials" who misuse their "public" offices, *see e.g. United States v. Hathaway*, 534 F.2d 386, 393 (1st Cir. 1976)—unambiguously includes within its ambit tribal leaders or officials that are not part of the polity of the United States or of any individual state or municipality. App.1804,1872-1875.

### 1. Standard of Review

The determination of the scope and applicability of a criminal statute is a question of law that this Court reviews *de novo. Brissette*, 919 F.3d at 676

### 2. Argument

The Hobbs Act imposes criminal liability on "whoever ... obstructs, delays, or affects commerce . . . by robbery or extortion or attempts or

conspires so to do . . . ." 18 U.S.C. § 1951(a). The statute defines "extortion" in the disjunctive as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, *or under color of official right*." *Id.* § 1951(b)(2) (emphasis added). Cromwell was indicted solely under the "official right" theory of extortion, App.63-64, 93-94, which this Court has identified as a "distinct form of extortion" delineated from the "'induced by wrongful use of actual or threatened force, violence, or fear' prong of the offense[.]" *Brissette*, 919 F.3d at 672 (citing *Evans*, 504 U.S. at 263-64).

The text of the Hobbs Acts does not define the phrase "under color of official right" and does not otherwise elucidate its scope. In the absence of such statutory guidance, the Supreme Court has ascribed to Congress an intent to adopt and incorporate the common law definition of extortion under color of official right, to wit: "an offense committed by *a public official* who took 'by colour of his office' money that was not due to him for the performance of his official duties." *Evans*, 504 U.S. at 260 (emphasis added). *Hathaway*, 534 F.2d at 393. ("The 'under color of official right' language reflects the common law definition of extortion, which could be committed *only by a public official*'s corrupt taking of a fee under color of his office and

35

did not require proof of threat, fear, or duress.") (emphasis added).

Consistent with this emphasis on *public* officials, every circuit that has

squarely considered the question "has held that, as general matter,

extortion under color of official right requires that the defendant be a

'public official,' that is, a person who holds an official position within the

government." *United States v. Percoco*, 317 F. Supp. 3d 822, 828 (S.D.N.Y.

2018) (citing cases) (holding that "only public officials—that is, persons

who hold official positions within the government—are capable of

committing the substantive offense of extortion under color of official right

as principals").

Given these unanimous judicial constructions limiting extortion

"under color of official right" to "public officials", the statute's prefatory

use of the broad term "whoever" is simply not determinative the statute's

reach or scope under that discrete theory. *Evans*, 504 U.S. at 263-264

(observing that while the Hobbs Act expanded the scope of common-law

extortion to include private individuals, "the portion of the statute that

refers to official misconduct continues to mirror the common-law

definition"). The question here, therefore, reduces to whether the term

"public official" was unambiguously understood at common law to

include the leaders of sovereign tribes. *Id.* at 259-260 (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952). ("Where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."). While there is little authority to assist in deciding this question[9], plainly nothing within the statutory language, the legislative history, or case precedent reveals any *affirmative* indication to include tribal officers within the concept of "public official."

There are several reasons to doubt such an understanding. In *Evans*, the Court stated that common-law extortion "by [a] public official was the rough equivalent of what [is] now describe[d] as 'taking a bribe.'" *Evans*, 504 U.S. at 260. It is therefore notable that neither 18 U.S.C. § 201, which Congress enacted to govern "[b]ribery involving public officials" on a

_____

[9] *See United States v. Manzo*, 636 F.3d 56, 62 (3d Cir. 2011) (observing that "when the Hobbs Act was passed, no mention was made of the meaning of extortion 'under color of official right' in the legislative history" and that its predecessors, the Anti-Racketeering Act of 1946 and the Anti-Racketeering Act of 1934 were likewise accompanied by "surprisingly little legislative history."

federal level, nor the provisions of the Model Penal Code ("MPC") broadly

addressing "Bribery in Official and Political Matters", suggest a definition

of "public official" extending outside the polity being regulated.[10]  See 18

U.S.C. 201(a)(1) (defining "the term 'public official'" to include "an officer

or employee or person acting for or on behalf of the United States, or any

department, agency or branch of Government thereof"); MPC Article 240, §

240.0 (defining "public servant" as "any officer or employee of

government, including legislators and judges, and any person participating

as juror, advisor, consultant or otherwise, in performing a governmental

function"). *Accord* M.G.L.A. c. 268A, § 2 (Massachusetts statute punishing

bribery involving "a state, county or municipal employee or a member of

---

[10] This Court's opinion in *United States v. Boots*, 80 F.3d 580 (1st Cir. 1996),
cited in the government's brief, is not to the contrary. In *Boots,* this Court
found language tracking the MPC's bribery provisions applicable to a tribal
official—the chief of police of the Passamaquoddy Tribe ("the Tribe")—but
did so by reading Maine's unique statutory definition of "Government"
which included entities "formed pursuant to interstate compact" against
the backdrop of various other statutes, also specific to the State of Maine
and the Tribe, which the Court noted "set up a relationship between the
tribes, the state, and the federal government different from the relationship
of Indians in other states to the state and federal governments." *Id.* at 592
(quoting *Penobscot Nation v. Stilphen*, 461 A.2d 478, 489 (Me. 1983)). In other
words, in *Boots,* unlike here, this Court was presented with state-specific
statutory language expressly incorporating the Tribe within the polity and
its officials within the definition of "public servant."

the judiciary or a person selected to be such an employee or member of the judiciary").

These circumscribed definitions of "public official" accord in scope with the central common-law concern, expressed in the concept of extortion "under color of official right", with the exercise of power given to an official by the public at large. *See* 4 William Blackstone, Commentaries on the Laws of England 141 (4th ed. 1770) ("extortion is an abuse of *public justice*"); *Wilkie v. Robbins*, 551 U.S. 537, 564 (2007) ("the crime of extortion focused on the harm of *public* corruption); *United States v. Mazzei*, 521 F.2d 639, 650 (3d Cir. 1975) ("the essence of the offense was the abuse of the *public trust* that inhered in the office"). There is no basis to presume that such "public" concerns extended at common law to the leaders of sovereign tribes like Cromwell. Indeed, the undisputed facts of the instant case point to the opposite conclusion—that neither the elections through which Cromwell obtained his positions, where voting was limited to a constituency of approximately 2,600 tribal members determined by ancestral lineage rather than geography or citizenship, nor the power he exerted on behalf of that constituency after election, were "public" in any sense of the word, and would not have been understood as such at

common law. *Cf. Judicial Stds. Comm'n v. Not Afraid*, 245 P.3d 1116, 1124 (Mont. 2010) ("tribal offices are creations of another sovereign and not considered public offices of the state").

Congress has demonstrated by its specific language in other statutory contexts that where it intends to include tribes and tribal officials within the scope of a federal statute, it will explicitly do so. *See* 18 U.S.C. § 666(a)(1) (extending criminal liability to "agent[s] of an organization, or of a State, local, or Indian tribal government, or any agency thereof").[11] The Hobbs Act's silence on this crucial question lends further ambiguity to the question of whether tribal leaders are "public officials" who may be deemed to have acted "under color of official right" under the Act. This inherent ambiguity is only compounded by absence of a single appellate decision by any court in the Hobbs Act's entire 78-year history, referencing or upholding the conviction of a *tribal* official, as opposed to a federal, state, or municipal official, for extortion "under color of official right" under the Act. *Cf. Wilkie v. Robbins*, 551 U.S. 537 (2007) (finding it "telling[]"

---

[11] It is notable that Congress added this tribal-specific language to § 666 by amendment after it was held that a statutory reference to "local government agency" was insufficiently specific to bring Indian tribes or their business councils within the statute's ambit. *United States v. Barquin*, 799 F.2d 619, 621-622 (10th Cir. 1986). See Pub. L. No. 99-646, § 59(a), 100 Stat. 3612 (1986).

in construing the scope of criminal liability, the lack of a "decision by any court, much less this one, in the Hobbs Act's entire 60-year history finding extortion" on the theory proffered).

In light the foregoing, "it cannot be said, with certainty sufficient to justify a criminal conviction," *Rewis v. United States*, 401 U.S. 808, 811 (1971), that Congress, in incorporating the common law phrase "under color of official right" into its definition of extortion, unambiguously intended to bring the acts of *tribal* officials, as opposed to federal, state, or municipal official, within the ambit of the Act on that discrete theory. The Supreme Court "ha[s] instructed that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity'" *Cleveland v. United States*, 531 U.S. 12, 25 (2000) (quoting *Rewis*, 401 U.S. at 812), and made clear that the rule of lenity applies to ambiguous applications of the Hobbs Act. *Scheidler v. NOW, Inc.*, 537 U.S. 393, 408-409 (2003). "When there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally v. United States*, 483 U.S. 350, 359-360 (1987). If "under color of official right" extortion is going to be extended for the first time to tribal leaders or officials that are not part of the polity of the United States

or of any individual state or municipality, "such a significant expansion of the law's coverage must come from Congress, and not from the courts." *Scheidler*, 537 U.S. at 409. There was no error in the Court's dismissals.

**B.    Alternatively, This Court May and Must Affirm the Judgments of Acquittal Below on the Additional Basis of Insufficient Evidence of Establish the Quid Pro Quo Element of Hobbs Act Extortion "Under Color of Official Right."**

As noted, Cromwell's Rule 29 motions argued in the alternative that he was entitled to acquittal on all of the Indictments arising under the Hobbs Act on the independent ground that the government's evidence at trial was patently insufficient to permit a rational juror to conclude, beyond a reasonable doubt and without undue reliance on speculation and conjecture, the existence of a quid pro quo in relation to any of the monetary donations or gifts provided to him. Although the district court ultimately granted acquittal on the grounds discussed above, making consideration of the sufficiency of the government's evidence with respect to the Hobbs Act unnecessary, it is well-settled that this Court may affirm the judgment below on any basis supported by the record. *United States v. Román*, 942 F.3d 43, 50 (1st Cir. 2019); *United States v. Rodríguez-Peña*, 470 F.3d 431, 433 (1st Cir. 2006); *United States v. Doe*, 61 F.3d 107, 111–12 (1st Cir. 1995). Accordingly, this Court may, and for reasons discussed below

must, affirm the judgments of acquittal below on the additional basis of insufficient evidence of the *quid pro quo* element of these offenses.

### 1. Standard of Review.

This Court reviews a preserved challenge to the sufficiency of the evidence *de novo*. *United States v. McPhail*, 831 F.3d 1, 5 (1st Cir. 2016).

### 2. Legal Standards.

Just as not every solicitation or receipt of a thing of value by an official qualifies as bribery under 18 U.S.C. § 666(a)(1)(B), not every solicitation or receipt by an official qualifies as "official right" extortion under 18 U.S.C. § 1951. "To establish guilt for extortion under color official right, the [government] must show . . . that the defendant, a public official, has received an emolument that he was not entitled to receive, with knowledge that the emolument was tendered *in exchange* for some official act." *Cruz-Arroyo*, 461 F.3d at 73. In other words, in extortion under color of official right prosecutions, like federal programs bribery cases arising under § 666, the government must prove the existence of a *quid pro quo*—a reciprocal understanding that "the public official receive[d] a payment in return for his agreement to perform specific official acts". *United States v. Correia*, 55 F.4th 12, 29 (1st Cir. 2022). *Turner*, 684 F.3d at 254 (accepting

without deciding that "implied reciprocity or *quid pro quo* is a requirement in non-campaign contribution cases").[12] In cases where a payment "takes the form of a campaign contribution," the standard of proof is higher, requiring the government to show that the payment was made "in return for an *explicit* promise or undertaking by the official to perform or not perform an official act." *McCormick*, 500 U.S. at 273; *United States v. D'Amico*, 496 F.3d 95, 101 (1st Cir. 2007) (requiring proof of a "*specific* quid pro quo" between the public official and the payor in campaign contribution case) (quoting *United States v. Cruzado-Laureano*, 404 F.3d 470, 482 (1st Cir. 2005)).

---

[12] Accord, App.1242, instructing the jury, without objection that:

> This case requires you to answer questions in the form of a verdict to resolve whether the government has proven what we've been calling, as a matter of Latin shorthand, a quid pro quo arrangement by the defendants through the exercise of a public official's authority corruptly to obtain a benefit for promising to be influenced regarding specific official acts.
>
>  . . .
>
> All ten of th[e] counts before you make those charges that are essentially themes and variations on the common fundamental contention made by the government that the defendant charged engaged in corrupt activity in which Mr. Cromwell clearly and unequivocally promised that he would perform an official act in exchange for a benefit.

### 3.    Argument

For reasons discussed above, in order to convict Cromwell on any the Hobbs Act Counts, the government was required prove his intent to effect a *quid pro quo* exchange for Cromwell's performance of, or agreement to perform, specific official acts to "protect" RGB's casino contract from termination. Count Six, alleging conspiracy to commit extortion, required proof of an agreement with DeQuattro to exchange money and other items of value for protection of the contract. *See United States v. Valentini*, 944 F.3d 343, 348 (1st Cir. 2019) ("To convict a defendant of a Hobbs Act conspiracy, the government must prove that the defendant possessed 'an intent to agree and an intent to commit the substantive offense.'") (citation omitted). The relevant substantive counts, Counts Seven, Eight and Ten, similarly required proof of a corrupt exchange of payment for official acts, or the promise of official acts. The instructions to the jury which, as discussed *infra*, were acquiesced to by the government and not patently incorrect, required the government to prove beyond a reasonable doubt that there was a clear and unequivocal agreement between Cromwell and DeQuattro that Cromwell, in exchange for each of the individual thing of value he received, would take specific actions to protect RGB's contract. Insofar as

the "thing of value" alleged to have been corruptly exchanged was "treated as" or "t[ook] the form of" a campaign contribution, the government bore an enhanced burden of demonstrating that the payment was given "in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *D'Amico*, 496 F.3d at 101 (quoting *McCormick*, 500 U.S. at 273). Here, for reasons explained at length *infra* and in Section I of Cromwell's opening brief, which is incorporated here by reference, the government's evidence at trial was patently insufficient to permit a rational juror to conclude, beyond a reasonable doubt and without undue reliance on speculation and conjecture, the existence of a *quid pro quo* in relation to *any* of the monetary donations or gifts provided to Cromwell—*i.e.* that *any* of those donations or gifts was given or received by reciprocal understanding *in exchange* for Cromwell's performance of, or agreement to perform, specific official acts to "protect" RGB's casino contract from termination , as the has government alleged.

The deficiencies in government's evidence are obviously even more pronounced when measured against the heightened standard of proof applicable where, as here, payments "take[] the form of a campaign contribution." *D'Amico*, 496 F.3d at 101. The government argues in its brief

that its evidence may not be held to any heightened *quid pro quo* standard on appeal—including the "clear and unequivocal" quid pro quo standard that, as discussed *infra*, it specifically requested below—because, the government declares, "a rational jury readily could have found that none of the convicted payments were campaign donations subject to *McCormick*." GB at 32-33. But the government fails to meaningfully develop this argument by grounding its declaration in a single piece of record evidence. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (deeming waived "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation."). But even if the government's argument is not deemed waived for lack of development, it lacks merit. The record demonstrates that, even as charged in indictment, the payments solicited by Cromwell were understood to be at least "in the form" of "donations to his reelection campaign and/or charitable contributions to One Nation Development" App.48,73. At trial, the government's star immunized witness, Beretta, testified repeatedly to his understanding of Cromwell's requests as

"contribution[s] to his re-election campaign" and that he and DeQuattro considered the fulfillment of those requests to be "a political contribution." App. 780,783,792,798,843-844. Evidence was presented that DeQuattro, when interviewed FBI, stated that the purpose of his donations was "Campaign help fundraising" and that he would donate again if asked, App.948[13], and that Cromwell, in relation to the 2015 payment charged in Counts Two and Seven of the Indictment, communicated in writing that the donation would be used "for Political Action Committee towards food, campaigns and elections" App:1577, a fact also specifically referenced in the indictments. Moreover, in light of the fact, stipulated to at trial, that tribal leaders like Cromwell are not subject to federal or state laws governing the solicitation, acceptance, recording or disbursement of campaign contributions, App. 1141-1142, the mere facts that the entities receiving the contributions were not registered with the Federal Election Commission (FEC) or that Cromwell may not have spent or accounted for donated funds in accordance with legal strictures wholly inapplicable to him fails to negate the evidence overwhelmingly establishing that the were

---

[13] At one point, the District Court noted being "stunned when I read [DeQuattro's] 302 [proffer] and realized that this really is fundamentally a campaign contribution case because the government has been passing it off like it's not really part of the case. It was at the core of this case. App.742.

treated, understood and "took the form" of campaign contributions and were therefore subject to the heightened standards established in *McCormick*, standards that, for reasons discussed, the government's evidence plainly failed to meet.

In sum, even if this Court becomes the first to construe Hobbs Act extortion "under color of official right" to reach Tribal, rather than just federal, state, and municipal leaders, this court may and must affirm the judgments of acquittal below on the additional basis of insufficient evidence of establish the *quid pro quo* element.

## VI. THE COURT SHOULD REJECT THE GOVERNMENT'S CROSS-APPEAL OF CROMWELL'S SENTENCE.

The government's cross-appeal of Cromwell's sentence, contending that the district court erroneously declined to enhance his GSR under U.S.S.G. § 2C1.1(b)(3), occupies just a single page of legal argument. The argument gestures broadly to commentary to the guidelines stating "that the term 'public official' shall be construed broadly' to include any person who 'act[ed] under color of law or official right,' G.B.85 (quoting § 2C1.1), but does not engage at all with Cromwell's substantive arguments why the phrase like "under color of official right" does not unambiguously encompass tribal leaders; it cites no case, or other authority, supporting

application of the enhancement in circumstances remotely analogous to those at issue here. To the extent that the government's lack of "developed argumentation" on this issue should constitute waiver of its cross-appeal, *Zannino*, 895 F.2d at 17, it is defeated for reasons explained at length in Section V.I *supra*, why in the absence of clear evidence of intent to designate Native American leaders like Cromwell "public officials" or persons acting "under color of official right." In these circumstances, application of § 2C1.1's enhancements involv[ing] an elected *public* official or any *public* official in a high-level decision-making or sensitive position" is also barred under the rule of lenity. *See United States v. Pinkham*, 896 F.3d 133, 138 (1st Cir. 2018) ("the rule of lenity is not limited to instances of statutory ambiguity. The rule may also apply in the context of the sentencing guidelines.").

## CONCLUSION

For reasons stated above and in Cromwell's opening Brief, the Court should reverse the Judgments and enter Judgment of Acquittal on Counts Two and Three and affirm the District Court's Judgment of Acquittal on Counts Six, Seven, Eight and Ten. At minimum, the convictions and restitution order should be vacated and the case remanded for a new trial.

Respectfully submitted,

APPELLANT CEDRIC CROMWELL

By /s/ Robert F. Hennessy
ROBERT F. HENNESSY
FIRST CIRCUIT NO. 1158975
BBO NO. 675977
SCHNIPPER HENNESSY, PC
25 BANK ROW, SUITE 2S
GREENFIELD, MA 01301
(413) 325-8541
FAX: (413) 325-8692
*rhennessy@schnipperhennessy.com*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

*Certificate of Compliance with Type-Volume Limit,*
*Typeface Requirements, and Type Style Requirements*

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **9,917** words (according to Microsoft Word's word count feature), excluding the parts of the brief exempted by Fed. R. App. P. Rule 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. Rule 32(a)(5) and the type style requirements of Feb. R. App. P. Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, using Microsoft Word in size 14 font, Book Antiqua type style.

/s/ Robert Hennessy
Robert Hennessy
*Attorney for Defendant-Appellant*

March 15, 2024

## CERTIFICATE OF E-FILING AND SERVICE

I certify that on March 15, 2024, the foregoing document was electronically filed with the United States Court of Appeals for the First Circuit by using the CM/ECF system, thus effectuating service on all parties to this appeal.

/s/ Robert Hennessy
Robert Hennessy
*Attorney for Defendant-Appellant*

March 15, 2024

Nos. 23-1116 & 23-1138

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,
*Appellee/Cross-Appellant*,

v.

CEDRIC CROMWELL,
*Defendants - Appellant/Cross - Appellee*

_____

*On Appeal From The United States District Court
For The District Of Massachusetts*

_____

# ADDENDUM

_____

1.    Case No. 1:20-cr-10271-DPW, Transcript of Motion Hearing via Videoconference, dated April 23, 2021 .................................................. ADD. 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


)
UNITED STATES OF AMERICA,      )
)                    Criminal Action
        Plaintiff,      )                    No. 20-10271-DPW
)
v.                             )
)
CEDRIC CROMWELL and            )
DAVID DEQUATTRO,               )
)
        Defendants.      )
)


BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE


HEARING
VIDEOCONFERENCE


April 23, 2021


John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1   APPEARANCES:

2   Counsel on behalf of United States:
    Christine J. Wichers
3   United States Attorney's Office MA
    1 Courthouse Way
4   Suite 9200
    Boston, MA 02210
5   617-748-3278
    christine.wichers@usdoj.gov

6
    Counsel on behalf of Defendant Cedric Cromwell:
7   Timothy R. Flaherty
    699 Boylston Street, 12th Flr.
8   Boston, MA 02116
    617-227-1800
9   timothyrflaherty@gmail.com

10  Counsel on behalf of Defendant David DeQuattro:
    Martin G. Weinberg
11  Martin G. Weinberg, PC
    20 Park Plaza
12  Suite 1000
    Boston, MA 02116
13  617-227-3700
    owlmgw@att.net

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2          COURTROOM CLERK:  For the members of the public and

 3     everybody, I just want to remind everybody about Local Rule

 4     83.3, which does not allow any photography, recording or

 5     broadcasting of these proceedings.  If everyone is all set, I

 6     will let the judge in.

 7          Criminal Action 20-10271, United States v. Cedric

 8     Cromwell and David DeQuattro.

 9          THE COURT:  Well, I think I should shape this

10     discussion a bit.  I appreciate being reintroduced to a body of

11     case law that I am somewhat familiar with, or was before.

12     After saying that I would entertain a further briefing, I

13     wasn't surprised to find out that afternoon that Judge Barron

14     would give us some more insight into the issues.  But I have

15     these problems.

16          Number one, I treat this as traditional motion to

17     dismiss practice, and insofar as motion to dismiss practice is

18     concerned, I don't know that I can say that the government

19     hasn't adequately alleged everything that's necessary for this

20     case.  Can they prove it?  I don't know.  But motion to dismiss

21     practice is directed to that.

22          The second issue, and also it arises from another of

23     Judge Barron's decisions, and it gives me great pause, is

24     *Brissette*.  *Brissette* was a case in which there was an effort

25     on the part of Judge Sorokin to provide detailed instructions
```

1    ahead of time to the benefit of the parties.  The government

2    wasn't entirely satisfied with them.  There was a stipulation

3    of fact that was meant to avoid the trial itself.  The

4    government's arguments, frankly, in the Court of Appeals may

5    not have been entirely consistent with the spirit, if not the

6    letter of the stipulations.  And as a consequence, Judge Barron

7    said, on behalf of the Court of Appeals, this has to be tried

8    without in any way impugning the government approach in

9    *Brissette* or here for that matter.

10          I would be very uncomfortable with anything that

11   required a great deal of investment of time and effort into

12   shaping a case without a trial, which brings me to the third

13   point.

14          This puts the government at risk.  If they are

15   prepared to go forward in the case on the basis of what's

16   alleged in the indictment, knowing, as they must know, that

17   this is a somewhat volatile area, that if at the conclusion of

18   the government's case or the conclusion of all the evidence in

19   the case I find that the government has not dealt adequately

20   with the larger issues of official act, for example, quid pro

21   quo, for example, then the government's going to be out of it.

22   It's going to be judgment of acquittal, and the judgment of

23   acquittal is likely to be at a time when the government doesn't

24   get a chance to retry the case.  But that's on them.  They make

25   that choice, they're going to be stuck with it.

1          And that brings me finally to the point of bill of

2     particulars.  I don't view the bill of particulars as a kind of

3     code pleading for federal criminal matters.  It's meant to fill

4     things out to identify what the nature of the case is that the

5     government alleges, and it seems to me that the government has

6     alleged its case here.  Again, whether or not they can prove it

7     is another matter, but they've alleged this case here, and I

8     don't see that I'm likely to order a bill of particulars in

9     this regard.

10         So that's the way I shape it.  It's perhaps

11     handicapping ahead of time, but I want counsel to be aware of

12     what they're arguing about here and where I'm coming from in

13     connection with that argument.

14         So, I don't know, Mr. Weinberg, are you going to take

15     the leading oar, laboring oar for --

16         MR. WEINBERG:  Thank you, Your Honor, and I appreciate

17     the framework, even though I recognize that it elevates the

18     burdens I face to persuade the court that the indictment

19     facially is insufficient with what I contend to be two gaping

20     holes.

21         THE COURT:  Right.

22         MR. WEINBERG:  One being an inadequate allocation of

23     what the quo is.  The quid is particularized.  It's the

24     payments made by Mr. DeQuattro, and the government is frank in

25     its various pleadings that their theory of prosecution, and

1    this is not set forth in the indictment but in their most

2    recent pleading, docket 91 at 3, they talk about the motivation

3    for the payments was fear that the contract would be canceled.

4    That appears nowhere in the indictment.

5        And I think the government would agree that a

6    subjective fear by Mr. DeQuattro, whether it's credibly

7    testified to or not, is an insufficient basis for a quid pro

8    quo exchange.  And it needs to be caused.

9        Assume this fear, it needs to be caused by some act or

10   statement of Mr. Cromwell, and I think that's the gaping hole,

11   Your Honor.  But for the generic phraseology in the superseding

12   indictment at paragraph 26 that the payments were in exchange

13   for favorable action or inaction on the contract, there is no

14   particularization as to what Mr. Cromwell did or didn't do to

15   communicate implicitly, explicitly, by act or by statement, why

16   Mr. DeQuattro should, A, be afraid, but more important, what he

17   should expect in exchange for the payments, which is the

18   pivotal issue that distinguishes bribery from gratuities.

19       And of course in this circuit bribery is required.

20   And Your Honor, from the *Woodward* litigation, is more familiar

21   than I with the nuances.  But the indictment has to set forth

22   something that would cause a fear or that would be in exchange.

23   The word "exchange" is, you know, a word that substitutes for

24   quid pro quo.  What did Mr. Cromwell do or say that was in

25   exchange for the payments?  Because otherwise the payments are

1    completely consistent as charged with gratuities, which of

2    course is an insufficient allegation under 666.

3          The only act other than the generic phraseology in

4    paragraph 26 is the writing of checks.  But that's neither an

5    official act.  That's the second hole that I'll address in a

6    moment, but they're consistent with nondiscretionary

7    ministerial acts.

8          There's no allegation that Cromwell gave or promised

9    preferential treatment; that the issue of whether or not a

10   check would issue was in dispute; that the contract or its

11   framework was taken to a vote.  The contract was executed

12   months before the payment, and there's no allegation there were

13   any discussions or promises about payment before the contract.

14         So I'm left, and I suggest that even in the

15   superseding indictment the government didn't particularize,

16   despite the motion to dismiss being filed before the

17   superseding indictment, any particularity that would give me

18   notice or that would satisfy the element of exchange which,

19   again, 666, it's not just enough to charge the words of the

20   statute.

21         There's a division in circuits as to whether the

22   statute requires a quid pro quo bribe, as the First Circuit

23   requires, or some lesser interrelation between payment and act,

24   as the Second and Sixth Circuit require.  And I respectfully

25   suggest, Your Honor, that neither the signing of the checks,

1    which is the only act, or the words "the inaction on a

2    contract," that either of those two frameworks fail to provide

3    any of the necessary assurance that the grand jury considered

4    or that I would receive notice that the government is prepared

5    to prove an exchange of the quo for the quid.

6         And therefore I believe that without even going beyond

7    the indictment and going to the government's recent pleadings,

8    where they talk about fear, in their original pleading they

9    talk about the agreement that the gambling authority would not

10   terminate the contract, but it too, that language, too, this

11   comes from the government opposition to the motion to dismiss

12   at 3, suffers from the same two deficiencies.  One, it's not

13   alleged; and two, there's nothing that provides in any

14   particularity that Mr. Cromwell did anything by action.

15        There's no pattern of official acts alleged, as there

16   usually is when a stream of benefits case like this is charged.

17   There is no specific act that would communicate to

18   Mr. DeQuattro that Mr. Cromwell has agreed to anything, and

19   inaction, not taking action on a contract respectfully

20   communicates nothing because there's no context.  And in fact,

21   there was never a dispute and never a vote about whether or not

22   to amend a contract, to enter a contract, to pay a bill or not

23   pay a bill.

24        And therefore, Your Honor, I think the first hole is

25   that more is required in a circuit that demands a quid pro quo

1    and an exchange than government paragraph 26, which alone in

2    such general terms sets forth their theory of case.

3          The second gaping hole, or I guess it's not that

4    gaping, it's a narrow hole, but it's, I contend, a legal hole,

5    is the failure to allege an official act.

6          The government takes the position that an official act

7    is not required, but if it is required, it can be proven.  I

8    contend it should be alleged, it must be alleged, and a failure

9    to act or not act on a contract, although if it was set forth

10   in a context where there was a vote on a contract, where a

11   contract was at issue, whether to enter it, that could satisfy

12   the narrowed definition of federal bribery that emanates from

13   the Supreme Court decision in *McDonnell*.  But those general

14   words without context do not provide notice that the government

15   is prepared and the grand jury did determine and that there is

16   an allegation of an official act.

17         And I contend that that issue is ripe for pretrial

18   determination.  And if Your Honor determines that in fact an

19   official act is required for 666, it clearly is for the

20   Cromwell extortion counts, it clearly is as a result of

21   *McDonnell* at 1346, which post-*Skilling* alleges bribery.  It

22   requires bribery very close to what 666 requires.  There's

23   really no principled reason why the standards for prosecuting

24   the 666 case should be more diluted or less specific than

25   prosecuting an honest services case.

1        But we have from last week the *Sally Lopez* case, which

2    at page 10 and 12 talk about the requirement of the official

3    act.  It's set forth that Lopez accepted a thing of value,

4    intending to be influenced to perform an official act.  And at

5    page 12 they talk about a series of official acts, citing to

6    *McDonough*, which is the Sal DeMasi First Circuit decision, the

7    Second Circuit decision in *Ganim*.

8        Certainly the First Circuit last week assumed, without

9    addressing it because it wasn't a necessary issue to the

10   resolution of the case, assumed an official act was required.

11   The government points to two circuits, three circuits that

12   don't require an official act, but those two of the three

13   circuits, the Second and Sixth, are circuits that don't require

14   bribery as a condition of 666, remembering Judge Lopez resolved

15   the conflict of the circuits in 2013 in the *Bravo Fernendez*

16   case, putting the First Circuit on the side of those circuits

17   that do.

18       And once you require a bribery, and Judge Lopez went

19   back and we have quoted him at page 7 of our motion, some

20   diamond grower formulation of what the lines are within the

21   federal bribery statute between gratuities and bribery, it's

22   very close to requiring, there's no reason not to require an

23   official act.

24       In all of the cases the government cites, the Third

25   Circuit *Cordaro* and *Repak* case, the First Circuit *Sally Lopez*

1    *Martinez* case, there is clear official acts.  And the failure

2    to articulate a single official act, much less what the stream

3    of payment cases require at least in their formulation, which

4    is a pattern of official acts in exchange for a stream of

5    benefit of payments, which in some respects relieves the

6    government of the requirement to connect a specific payment

7    with a specific act.

8         With the *McDonough* case formulation, and I believe

9    it's the formulation for Your Honor's instruction in the

10   *Woodward* case, a pattern of official actions favorable to the

11   donor are required.  And there's simply no notice in this

12   indictment of a pattern of official acts.  There's no notice of

13   a single official act.  And yes, the definition of official

14   acts has changed in Governor McDonnell's case.  But it has

15   always been assumed in the First Circuit that an official act

16   is required.

17        Sometimes the 1951 cases, *Turner* case, other cases,

18   sometimes they're honest services cases, but from the language

19   of *Bravo Fernandez*, which is a 666 case, where they talk about

20   official acts, the language in the *Sally Martinez* case that

21   talks about official acts, I think Your Honor has the basis

22   from the First Circuit to make a decision that an official act

23   and not just some public official's conduct is required for a

24   666.  And if it's required, it's an element and it's not

25   charged with some generic phraseology about action or inaction

 1    that could be an official act if it's particularized, but it's

 2    not necessarily an official act because acts in a contract, a

 3    failure to act could be writing a check, it could be sitting

 4    there and looking at an invoice and saying nothing.

 5            Unlike most cases here, there's no allegation that the

 6    contracts were voted on.  There's no allegation that they were

 7    amended.  There's no allegation that anybody disputed an

 8    invoice.  Inactivity on a contract communicates nothing.

 9    Signing a check communicates nothing.  And neither of those two

10    general allegations are coextensive with the requirements of an

11    official act as set forth by the many cases that we've provided

12    the court.

13            I would respectfully ask the court to dismiss this

14    indictment because of these two holes that I think provide

15    insufficient notice and I believe do not meet the standards of

16    Rule 12.  Thank you, sir.

17            THE COURT:  Thank you.  So Ms. Wichers, do you want to

18    address that issue, or those two issues?  The issue of quid pro

19    quo agreement, assume that I may well charge the jury quid pro

20    quo agreement required.  Second, official act, do you want to

21    tell me where I find that -- where you think I find it in the

22    indictment that's been alleged here.

23            MS. WICHERS:  Thank you, Your Honor.  It's alleged in

24    exactly the language Mr. Weinberg contends is insufficient.

25    That language is not insufficient.

1          THE COURT:  Well, let's look at the language

2    specifically.  Where?

3          MS. WICHERS:  All right.  I'm just pulling it up, I'm

4    sorry, Your Honor.  It's the language in the Manner and Means

5    section.

6          THE COURT:  Just give me a paragraph.

7          MS. WICHERS:  Sorry.  It's in the Objects and

8    Purposes, paragraph 26.

9          THE COURT:  I'll pull it out.  That's it?

10         MS. WICHERS:  That's it.  It's the quid and the quo.

11         THE COURT:  So let's assume what Mr. Weinberg has been

12   suggesting is the state of the record here, which is that there

13   was a contract terminable at will but no actions taken one way

14   or the other with respect to it, no indication of dispute over

15   an invoice, no indications of an attempt to bring up

16   termination, simply a contract terminable at will and payments

17   made to Mr. Cromwell.

18         MS. WICHERS:  Yes.

19         THE COURT:  Is that enough?

20         MS. WICHERS:  Yes, it is.  The indictment alleges the

21   what the --

22         THE COURT:  I know what the indictment alleges.  At

23   this point I'm now taking language that I think you view as

24   having near infinite elasticity and suggesting that there is in

25   a circumstance, a set of circumstances, which may be the only

 1    set of circumstances proved by the government, that there was a

 2    terminable at-will contract and there were payments made to Mr.

 3    Cromwell.

 4         MS. WICHERS:  Right.  And we also allege that the

 5    contract, if it were to be terminated, the body that could

 6    terminate it was the gaming authority.

 7         THE COURT:  Okay.  We'll add that.  That's clear, that

 8    we're dealing with a contract that's terminable at will, and

 9    Mr. Cromwell has some role in the supervision of that contract.

10         MS. WICHERS:  Correct.

11         THE COURT:  Okay.  So no indication that the contract

12    was being terminated; no indication that Mr. Cromwell was

13    reviewing an invoice that might not be -- would be adversely

14    affected by his action.  Simply that he was there and could, if

15    he chose to, do something about it.  That's enough?

16         MS. WICHERS:  Yes, it is enough.  He accepted the

17    stream of payments and benefits.  I understand what you're

18    saying, Your Honor.  I understand what Mr. Weinberg is saying.

19    But those are really jury arguments.

20         THE COURT:  Well, they are, but I want you to be clear

21    on taking the position that you're taking, which is that you're

22    putting your case at risk of leading to a judgment of acquittal

23    after the evidence comes in in a circumstance in which you

24    would not have a right of appeal.

25         MS. WICHERS:  I understand that.  But the two

1    arguments, as I understand it, that Mr. Weinberg is making is,

2    number one, where does it say in the indictment specifically

3    what the threats or the communications were by Mr. Cromwell to

4    Mr. DeQuattro, "If you don't give me money, X or Y is going to

5    happen to the contract."  Well, of course we don't have to

6    prove that at trial, and we don't have to allege it in the

7    indictment.

8              THE COURT:  Don't count on you not having to prove it

9    at trial.  Mere minatory concerns would not necessarily be

10   enough.  We're dealing with specific intent crimes, and I'm

11   going to have to review whether or not the government has

12   submitted sufficient evidence to show that it was something

13   other than the nature of the relationship, that is to say they

14   dealt together in respect of a -- they dealt together and had a

15   relationship at the same time that they had a business

16   relationship that could be terminable at will.  And one is

17   supposed to infer from that that they intended to influence

18   him, and he intended to be influenced.

19             MS. WICHERS:  Right.  And we will have evidence to

20   that effect.

21             THE COURT:  What is it?

22             MS. WICHERS:  I expect that the evidence is going to

23   show that the --

24             THE COURT:  No, not what it's supposed to show.

25   What's the evidence that you have that's going to show the

**ADD:015**

1    intent, specific intent here?

2          MS. WICHERS:  The evidence that we have is going to

3    come from the co-conspirator's testimony primarily, that is the

4    company president.  He's the one who communicated with

5    Mr. DeQuattro about the demands made by Mr. Cromwell, what he

6    wanted and what their understanding was about what would

7    happen --

8          THE COURT:  Is that disclosed with particularity in

9    the indictment?

10          MS. WICHERS:  No, Your Honor.

11          THE COURT:  There's one reference to Mr. DeQuattro

12    with what I suppose could be said a sigh communicating to the

13    co-conspirator that, "Here we go again, no big surprise," words

14    to that effect.  But there's more?

15          MS. WICHERS:  There is more in terms of what the

16    co-conspirator will testify to at trial.

17          THE COURT:  Okay.  So now, is there any evidence other

18    than the co-conspirator?

19          MS. WICHERS:  Well, the most important evidence is the

20    payments that were made.

21          THE COURT:  Apart from things that are disclosed and

22    that you're alleging.  You're alleging that these payments were

23    evidence of bribery?

24          MS. WICHERS:  Yes.

25          THE COURT:  There are other ways to conceive them, and

1    those other ways are to some degree developed in *McDonnell*, but

2    it's clear that the Supreme Court and I think the First

3    Circuit, too, are asking for greater particularity.  But in any

4    event, insofar as those payments are concerned, the ones you're

5    going to rely on, they are as alleged in the indictment, right?

6             MS. WICHERS:  Yes.

7             THE COURT:  Okay.  Anything else that bears on the

8    specific intent of the defendants?

9             MS. WICHERS:  It's alleged in the indictment.  So it

10   goes to how did Mr. DeQuattro make those payments?  Did he make

11   them to Mr. Cromwell personally?  Did he make them to the

12   committee to reelect Mr. Cromwell?  No.  He made them to the

13   C.M. International Consulting LLC.

14            THE COURT:  Okay.  So I'm supposed to infer from the

15   fact or a reasonable juror is supposed to infer from the fact

16   that the defendant wanted to have this kept concealed or at

17   least not disclosed transparently that this must be a quid pro

18   quo for a bribe.

19            MS. WICHERS:  That's one of the pieces of evidence.

20            THE COURT:  I'm trying to figure out what I'm supposed

21   to make of it.  The other is to say, if it were standing alone,

22   would that be enough?

23            MS. WICHERS:  If what were standing alone, just the

24   payment?

25            THE COURT:  Just the concealed payment, the contrived

1    concealed payments.

2         MS. WICHERS:  Well, no, because we have it, the first

3    payment is eight days after the first check from the gaming

4    authority to the company on the contract.  I get the first

5    check for $10,000.

6         THE COURT:  Let me just ask, are you saying that this

7    is a quid pro quo for the payment?

8         MS. WICHERS:  This is a quid pro quo to keep the

9    contract and --

10        THE COURT:  Not for the payment?

11        MS. WICHERS:  The check itself, no.

12        THE COURT:  Okay.  So what we're talking about is to

13   keep the contract in place, and this is evidence of the ongoing

14   contractual undertakings of receiving invoices and paying

15   invoices.

16        MS. WICHERS:  And making sure that the contract

17   doesn't get terminated.

18        THE COURT:  Okay.  So let me talk about making sure

19   the contract isn't terminated.  What's the evidence of that?

20        MS. WICHERS:  It's -- again, it's the evidence of the

21   payments and the concealment and the timing.

22        THE COURT:  Okay.

23        MS. WICHERS:  Why does Mr. Cromwell -- why does

24   Mr. DeQuattro pay Mr. Cromwell $10,000, $10,000, $10,000,

25   $10,000, here is a gym, here is $4,000, and here is a hotel

1   stay, over the same period of time that the company is

2   collecting money on this very lucrative contract for the

3   company; why is that?

4           THE COURT:  Well, I guess the burden is on you to

5   explain it.

6           MS. WICHERS:  Yes.

7           THE COURT:  And that burden requires a showing of

8   specific intent.  And what you've told me about is a colocation

9   of circumstances, to use the language that attaches to federal

10  criminal conspiracy cases.

11          I'm looking for something that tells me directly or

12  indirectly what the intent of the defendants was.  And you tell

13  me that the ligament that ties that together is going to be the

14  testimony of the co-conspirator.

15          MS. WICHERS:  Yes.

16          THE COURT:  Okay.  So what is the state of the

17  disclosure of *Jencks* material?

18          MS. WICHERS:  We have not produced *Jencks*.

19          THE COURT:  Pardon me?

20          MS. WICHERS:  We have not produced *Jencks*.

21          THE COURT:  Okay.  When are you going to produce it

22  with respect to the co-conspirator?

23          MS. WICHERS:  When we are ordered to do so.  We have

24  told the -- we've communicated to the defense anything

25  exculpatory in the co-conspirator statements.

1          THE COURT:  Okay.  And is there any objection to you

2    being ordered at this point to turn over the entire *Jencks* of

3    the co-conspirator?

4          MS. WICHERS:  Yes.

5          THE COURT:  What?

6          MS. WICHERS:  That it is not in compliance with the

7    Jencks Act, that we should produce it and will produce it

8    typically 21 days before trial.

9          THE COURT:  So if I say all right, maybe having heard

10   this, I think that a bill of particulars is necessary, and the

11   bill of particulars should include every statement by any

12   co-conspirator evidencing the relationship of those payments to

13   the government's theory that they constitute both quid pro quo

14   and are evidence of official acts.

15          I mean, we can fence with this a little bit.  If you

16   want to press me on the Jencks Act, I'll be glad to deal with

17   that.  And then the question of course becomes whether or not

18   the matter is taken up just before the trial.  One way to deal

19   with it is to say, "Here it is.  We've got it."  But you seem

20   to be resistant to doing that, apart from saying that, "Here is

21   what the Jencks Act says."  I'm not sure why there is

22   resistance.

23          MS. WICHERS:  Well, it is also not for me to say as a

24   line AUSA.  We have an office policy, and we have a DOJ policy.

25          THE COURT:  Well, do you have an office policy and a

1  DOJ policy that doesn't say we absolutely never turn over

2  Jencks Act material in advance of the time period for *Jencks*,

3  that is, after the cross-examination?

4      MS. WICHERS:  No.  Our office policy is to do it in

5  compliance with the court's order, which is almost always 21

6  days before.

7      THE COURT:  Right.  So you wait for the court to order

8  it before you do it?

9      MS. WICHERS:  Yes.

10     THE COURT:  You don't provide that kind of *Jencks*

11 material as a part of open file policy from time to time in the

12 appropriate case?

13     MS. WICHERS:  Not to my knowledge.  I'm sure there are

14 exceptions, but I'm not aware of any.

15     THE COURT:  Okay.  Well, you're playing with fire.

16 That's all I can tell you.  And I will think very carefully

17 about this because it seems to me that it deals with a question

18 of some significance for purposes of providing the defense with

19 an understanding of what they're confronting.

20     Now, the communications, at least as I understand it,

21 between the two defendants here were between the two defendants

22 here, and the communications with the unindicted co-conspirator

23 were solely between Mr. DeQuattro and the unindicted

24 co-conspirator.

25     MS. WICHERS:  Correct.

1          THE COURT:  Okay.  There's no communication from Mr.
2     Cromwell with the unindicted co-conspirator?
3          MS. WICHERS:  Correct.
4          THE COURT:  Okay.  So how does that testimony, which
5     is presumably available, or one of them, by Mr. DeQuattro apply
6     to Mr. Cromwell?
7          MS. WICHERS:  How does the testimony of the
8     unindicted --
9          THE COURT:  How does it evidence that Mr. Cromwell
10    knew that the co-conspirator was treating this as quid pro quo?
11         MS. WICHERS:  It doesn't, because there was no
12    communication between the co-conspirator and Mr. Cromwell as
13    well.
14         THE COURT:  Okay.  So in the case of Mr. Cromwell,
15    we're just down to the colocation of circumstances of payments
16    made on particular occasions without any evidence, by a human
17    being, of a reasonable understanding that was reflected in Mr.
18    Cromwell's response.
19         MS. WICHERS:  That's right.  Acceptance of those
20    payments and benefits in terms of the timing, the fact that he
21    was not entitled to them, the fact that he directed that they
22    be paid.
23         THE COURT:  What do you mean "entitled"?  Let's assume
24    that Mr. DeQuattro is a generous man, okay, and his generosity
25    is triggered by periodic inquiries about birthday parties from

1    Mr. Cromwell.  Does that meet quid pro quo?

2            MS. WICHERS:  That's an evidentiary argument for the

3    jury --

4            THE COURT:  It is, it absolutely is an evidentiary

5    argument, and the question to me that I keep pointing to is you

6    are playing with fire on this, and you are running a risk that

7    I think can be addressed by advanced disclosure of

8    co-conspirator statements so that I can understand this more

9    fully earlier on and give you a heads-up on what you're going

10   to have to prove to get to the jury.  And of course, if you

11   don't get to the jury and the jury has been sworn, jeopardy has

12   attached.

13           MS. WICHERS:  Understood.

14           THE COURT:  And you don't get to retry it.

15           MS. WICHERS:  Understood.

16           THE COURT:  Okay.  So I take it that that's your view

17   and you're sticking to it?

18           MS. WICHERS:  Yes, sir.

19           THE COURT:  Okay.  I will consider that in light of my

20   evaluation of whether or not the government has forced someone

21   to a trial who does not necessarily have to go to trial or

22   shouldn't go to trial.

23           My own view is with the kind of general review that is

24   given to cases even like this that there is sufficient

25   allegation here to comply with First Circuit law as to quid pro

1   quo and official act.  But it's thin and it is something that

2   could well lead to a judgment of acquittal if it's not

3   presented with a more robust response than I've heard so far.

4          But the office of a motion to dismiss is not fully to

5   test the evidence.  It's simply to identify for the defendants,

6   both defendants here, what it is that the government is

7   undertaking to prove and whether or not, if they prove it, they

8   proved a crime.  I don't view the indictment, as I said

9   earlier, as being an object of code pleading only on the

10  criminal side, and I don't view those particulars as being an

11  adjunct to provide something like code pleading.  Nevertheless,

12  I note with anxious concern whether or not this is a case that

13  can make it to the jury.

14         But I'm going to deny motions to dismiss.  With

15  respect to the bill of particulars, this conversation has

16  provided additional information about the sources from which

17  the defendants can expect to find the evidence that the

18  government says will provide the ligaments -- or I said and the

19  government didn't disagree, I'm not asking that you agree with

20  my language -- but the ligaments that tie these particular

21  circumstances together are a testimony of the co-conspirator

22  here, the full reflection of which the government declines to

23  provide on a more timely basis for reasons having to do with

24  purported government policy that is never deviated from or only

25  in exceptional cases, raising the question of why is this an

1    exceptional case.

2         And I'll look at it fairly carefully.  I think the

3    defendants know what's coming and where it's coming from here.

4    And that's all that the bill of particulars and the motion to

5    dismiss practice is supposed to provide.  Anything further?

6         MR. FLAHERTY:  On behalf --

7         MR. WEINBERG:  Just very quickly, Your Honor.  The

8    co-conspirator's testimony to the government was under a grant

9    of immunity.  It was after he had been threatened with making

10   false statements to the government with the FBI originally.

11        THE COURT:  Make the argument to the jury.

12        MR. WEINBERG:  Okay.

13        THE COURT:  I mean, I can understand where it is, but

14   the jury believes him or they don't; and his testimony is

15   sufficient or it's not.  I'm not going to make a determination

16   about credibility of the witness but whether or not there's

17   adequate evidence.

18        MR. WEINBERG:  I'm only saying that, Judge, in terms

19   of asking the court to reconsider whether or not the defendant

20   should receive prior to 21 days before trial -- this is a

21   policy that has had many exceptions in my personal

22   experience -- receive some understanding of the heart of the

23   co-conspirator statement.

24        THE COURT:  I don't disagree as a matter of policy

25   with that view, but I don't express the policies of the

1   government.  On the other hand, if the government adheres

2   rigidly to policies, I will adhere rigidly to who gets put in

3   the awkward position of not getting an appeal because they've

4   allowed a jury to be sworn without developing this more

5   completely.

6          Does this have to be the subject of this rigid no

7   exception?  I haven't been told anything that tells me that it

8   should.  And like you, I have observed these policies and their

9   exceptions over the years.  Sometimes the insistence on

10  exceptions is evidence -- well, I won't call it evidence but an

11  occasion of a case not strong enough to bear the light of day

12  early enough to explore.  But that's the position the

13  government is taking here.  They may want to reconsider that.

14  They've got time, but we're going to trial in this case.  And

15  then it gets tested, and then the jury gets sworn, then the

16  government is at risk and it's no longer a kind of bravado that

17  says we're ready to do it.

18          It's the victim on the floor having made a conscious

19  choice to proceed without full development of the matter in

20  pretrial and the direction that the court can give with respect

21  to that pretrial if it's pursued, but I don't really understand

22  why there is not disclosure here.  Of course it's not

23  immediately after direct examination, which is what the Jencks

24  Act calls for.  And to the degree that it creates problems of

25  further discovery being necessary because it's belated, I'll

1    consider whether that has a role to play in this.

2          The short of it is I haven't heard anything from the

3    government that justifies holding back on what seems to be

4    critical information.  But I don't make those choices, at least

5    at the outset I don't make those choices, but I have choices of

6    my own that I will have to make in the face of that.

7          I'm sorry, Mr. Flaherty, I cut you off, and I think

8    Mr. Weinberg had some additional things that he wanted to say,

9    but go ahead.

10          MR. FLAHERTY:  I defer to Mr. Weinberg, Judge, and I

11    won't repeat his very persuasive arguments on the bribery

12    counts, but I think when you consider them on the extortion

13    counts, I disagree.  I believe it's a pleading standard, not an

14    evidentiary standard.

15          When you look at the *Evans* case and the *McCormick*

16    case, the *Evans* case, as the court, as you did, Your Honor,

17    instruct in the *Turner* case, a gratuity is considered a payment

18    extorted under color of right only if the public official knows

19    that it was offered in exchange for official acts and then he

20    implicitly agrees to perform them, and there's no allegation in

21    the indictment to that.

22          So I think Mr. Weinberg's very persuasive argument,

23    when applied to the extortion counts, become more persuasive.

24    And on the heightened standard under *McCormick*, when we

25    consider, as the government describes these, pretextual

1    campaign contributions, the requirement is that there's an

2    explicit quid pro quo, an explicit promise, and there's none

3    pled in the indictment.

4            So I know the court has seized on the issues and has

5    focused on the specific issues here, but my questions would be

6    what's the specific requested exercise of official power, and

7    what was the explicit promise asserted?  And I'm not suggesting

8    that my argument is a sufficiency of the proof at this stage,

9    but even for a pleading requirement, Mr. Cromwell is left in

10   the dark.  And the Sixth Amendment -- and that's the reason for

11   my request for a bill of particulars.  The Sixth Amendment

12   guarantees him a right for not just the statutory allegations

13   but some nature of those allegations.  And my view is he's left

14   in the dark at this stage, but I appreciate the court's

15   concerns with the Jencks Act, and maybe that will clarify

16   things for us.

17           THE COURT:  Right.  Maybe.  My own view, as I said, is

18   it's impossible to tease out of this compliance with the

19   standards but also pleading here.  It is a bit elliptical in

20   that regard, particularly given the kind of theory that the

21   government is proceeding on, and I've given them forewarning.

22           So the government will do whatever it wants to do in

23   this area, knowing what the consequences can be of avoiding,

24   for reasons not articulated as anything other than an office

25   policy subject to exception, the refusal to turn over in a more

1    timely fashion, an earlier fashion, Jencks Act with respect to

2    the co-conspirator.

3         But my obligation is, and I view it as consistent with

4    the way in which the Federal Rules of Criminal Procedure have

5    to be read, is that the motion to dismiss is not a preliminary

6    evaluation of the sufficiency of the evidence but simply a way

7    of determining whether or not there's sufficient notice to the

8    defendants about the case that incorporate all of the essential

9    elements and that the bill of particulars is quite unusual

10    because it becomes essentially an adjunct to the indictment

11    itself, and I've evaluated that indictment in this way.  But it

12    pushes off until a later point the confrontation with the

13    difficult issues here.

14         This much I'm clear about, is that the defendants know

15    what they're facing here.  They don't have the particularity

16    that would be provided by code pleading or all of the evidence

17    in the case, but the cases never ask for that.  To the degree

18    that Mr. Weinberg repeatedly references the question of whether

19    or not the grand jury received adequate evidence of course

20    after *United States v. Costello*, that's not a matter for

21    pretrial determination.  It falls out of the case for reasons

22    that a federal policy that differ obviously from state policy

23    in evaluating sufficiency of matters before the grand jury.

24         But I'm here to play by the rules.  Those are the

25    rules, as I understand them.  I understand the parties disagree

1   with them, and the parties always have to be concerned, both

2   the defense and the government, that having pressed for the

3   rigid enforcement of the rules that the rules don't turn around

4   or other rules don't turn around and bite them.

5          But everybody understands what's going on here on it,

6   and we've got a trial date, and I'm holding to it, and I'm

7   certain that I can try this case at that time.

8          MR. WEINBERG:  Judge, do we have a trial date certain?

9          THE COURT:  I'm sorry.  Did Ms. Beatty not communicate

10  it?  We will be picking the jury the week before Labor Day and

11  start immediately after Labor Day.

12         MR. WEINBERG:  Thank you.

13         THE COURT:  I'm sorry if I didn't direct that

14  specifically, but that's what we've got.  I've carved that out.

15  That's the part of the, not negotiations with my colleagues,

16  but to the degree that we have to have the same kind of social

17  distancing that we're talking about here, that's what's going

18  to happen.

19         It's also going to mean, I think, that we're going to

20  have to take a census about who is going in the courtroom.  I

21  will tell you, you'll be able to see what's happening in the

22  *Correia* case, but it's 26 people in the courtroom, and that's a

23  one-person case, and it's very tight to keep that many people

24  in or limit the number of people in the courtroom.  And that

25  case raises some of the same questions but perhaps not quite

1   with the same degree of ambiguity as to the allegations.

2        Okay.  So we're in recess on this matter.  If other

3   matters come up, we'll deal with that, but I will be issuing an

4   order of excludable time through the beginning of the trial

5   itself, trial selection the week before Labor Day and then

6   starting afterwards.

7        And obviously you will want to talk to the people who

8   have tried a case before me to see how that process has worked

9   out, and I'm open to changes or modifications so long as

10  they're consistent with social distancing that still is in

11  place here in Boston and I suspect will be into the fall as a

12  prophylactic.

13       I have an obligation I think to provide a safe space

14  to try a case, but it also has to appear to be safe for jurors,

15  and so various kind of mitigation measures, which may not be as

16  supportable now based on developments, are still ones that I'm

17  going to be enforcing.  Wiping down, that kind of thing, the

18  surfaces and so on.  But we'll have some experience with it,

19  and we'll apply that experience to you folks, and we'll have

20  some pretrials that go through that because I don't want

21  anybody surprised about how the trial process is going to work.

22  Okay?

23            MR. WEINBERG:  Thank you, Judge.

24            THE COURT:  Okay.  Thank you.  We will be in recess.

25            MS. WICHERS:  Thank you.      (Adjourned, 3:53 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Kelly Mortellite, Registered Merit Reporter

4   and Certified Realtime Reporter, in and for the United States

5   District Court for the District of Massachusetts, do hereby

6   certify that the foregoing transcript is a true and correct

7   transcript of the stenographically reported proceedings held in

8   the above-entitled matter to the best of my skill and ability.

9                    Dated this 11th day of May, 2021.

10

11                    /s/ Kelly Mortellite

12                    _____

13                    Kelly Mortellite, RMR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25